# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v LYMON

Docket No. 164685. Argued January 11, 2024 (Calendar No. 2). Decided July 29, 2024.

Cora Lymon was convicted by a jury in the Wayne Circuit Court of three counts of torture, MCL 750.85; three counts of unlawful imprisonment, MCL 750.349b; one count of felonious assault, MCL 750.82; and one count of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant held his wife and their two children at gunpoint in the family's home for hours, threatening to kill them and burn down their house. The court, Dana M. Hathaway, J., sentenced defendant to 126 to 240 months' imprisonment for the torture convictions, 84 to 180 months' imprisonment for the unlawful-imprisonment convictions, 24 to 48 months' imprisonment for the felonious-assault conviction, and two years' imprisonment for the felony-firearm conviction, to be served consecutively with the other sentences. Additionally, because two of defendant's unlawful-imprisonment convictions involved minors, defendant was placed on the sex-offender registry as a Tier I offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. Defendant appealed his convictions, arguing that there was insufficient evidence to sustain his torture convictions and that because his conviction of unlawful imprisonment of a minor lacked a sexual component, his placement on the sex-offender registry violated US Const, Am VIII and Const 1963, art 1, § 16. Defendant's case was held in abeyance for several years pending the resolution of related cases in the Supreme Court. In 2022, the Court of Appeals, K. F. KELLY, P.J., and M. J. KELLY and RONAYNE KRAUSE, JJ., affirmed defendant's convictions but remanded the case for entry of an order removing defendant from the sex-offender registry, concluding that imposition of SORA, as amended by 2020 PA 295, effective March 24, 2021 (the 2021 SORA), for a crime that lacks a sexual component constituted cruel or unusual punishment under Const 1963, art 1, § 16. 342 Mich App 46 (2022). Defendant sought leave to appeal his convictions in the Supreme Court, and the prosecution cross-appealed regarding the removal of defendant from SORA. The Supreme Court denied defendant's application but granted the prosecution's cross-application; the Supreme Court directed oral argument to address whether requiring a defendant to register as a sex offender for a non-sexual crime constitutes cruel or unusual punishment under Const 1963, art 1, § 16 or cruel and unusual punishment under US Const, Am VIII. 511 Mich 860 (2023).

In an opinion by Chief Justice CLEMENT, joined by Justices BERNSTEIN, CAVANAGH, WELCH, and BOLDEN, the Supreme Court *held*:

Imposition of SORA, as amended by 2020 PA 295, on a non-sexual offender constitutes cruel or unusual punishment under Const 1963, art 1, § 16.

1. When the Michigan Legislature enacted SORA in 1994, the sex-offender registry was a confidential database, accessible only to law enforcement; the act required that persons convicted of certain sex offenses register and notify law enforcement of address changes. In the years since, the Legislature's repeated amendments of SORA transformed it into a publicly accessible registry that restricted registrants' movements and required registrants to regularly report various life details and changes to law enforcement in person. In 2021, *People v Betts*, 507 Mich 527 (2021), held that the retroactive application of SORA, as amended by 2011 PA 17 and 2011 PA 18 (the 2011 SORA), imposed increased punishment on defendants, thus violating constitutional ex post facto protections. Although the *Betts* Court concluded that the Legislature had likely intended the 2011 SORA as a civil remedy rather than a criminal punishment, it further concluded that the statute was so punitive in effect that the 2011 SORA constituted criminal punishment despite that legislative intent. In assessing the punitive effects of the 2011 SORA, the *Betts* Court emphasized several particularly onerous facets of the 2011 SORA, including the student-safety zones that prohibited registrants from residing, living, loitering, or working within 1,000 feet of a school; the immediate reporting requirements that forced registrants to report in person to law enforcement upon potentially frequent life changes; the calculation of reporting duration being based on an offender's conviction rather than an individualized assessment of the risk a particular offender posed to the community; and the publication of an offender's tier status on the public website. Before *Betts* was decided, the Legislature enacted the 2021 SORA, which implemented various ameliorative provisions, including removing the student-safety-zone prohibitions; no longer categorizing assignments under the Holmes Youthful Trainee Act, MCL 762.16 *et seq*., as registrable offenses; no longer categorizing expunged convictions as registrable offenses; removing registrants' tier classification from the public website; adding a requirement that the failure to register be a willful failure to comply; and providing that the Michigan State Police may create means other than in-person reporting by which registrants provide immediate information updates to law enforcement. However, the 2021 SORA also implemented other and potentially more-onerous changes, including requiring registrants to report to law enforcement all designations used for self-identification or routing in Internet communications or posting.

2. Const 1963, art 1, § 16 prohibits the state from inflicting cruel or unusual punishment. The first inquiry under that constitutional provision was whether the 2021 SORA constituted punishment. To determine whether a statute constitutes punishment, the court must first determine whether the Legislature intended the statute as a criminal punishment or a civil remedy. If the statute imposes a disability for the purpose of reprimanding the wrongdoer, the Legislature likely intended the statute as a criminal punishment. However, if the statute imposes a disability to further a legitimate governmental purpose, the Legislature likely intended the statute as a civil remedy. If the court determines that the Legislature intended the statute as criminal punishment, then the court must conclude that the statute is indeed punishment. However, if the court determines that the Legislature intended the statute as a civil remedy, the court must then consider whether the statutory scheme is so punitive either in purpose or effect as to negate the state's intention to deem it civil. The Legislature's intent will be rejected only when a party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect as to negate the state's intention to deem it civil. In this case, the reasoning from *Betts* was

adopted to conclude that the Legislature intended the 2021 SORA as a civil regulation; accordingly, the pertinent determination was whether the statutory scheme was so punitive either in purpose or effect as to negate the state's intention to deem it civil.

3. The seven factors outlined in *Kennedy v Mendoza-Martinez*, 372 US 144 (1963), guide courts in their consideration of the punitive purpose or effect of a statute. In the context of the constitutionality of sex-offender-registry statutes, the United States Supreme Court and the Michigan Supreme Court have identified the following five of these seven factors as having particular relevance: (1) whether the statute has historically been regarded as punishment; (2) whether the statute imposes an affirmative disability or restraint; (3) whether the statute promotes the traditional aims of punishment; (4) whether the statute has a rational connection to a nonpunitive purpose; and (5) whether the statute is excessive with respect to its nonpunitive purpose. In this case, while sex-offender-registry laws are of relatively recent origin and so have no direct analogies to punishment in this nation's history and traditions, they may still resemble punishment. The 2021 SORA did not bear resemblance to the traditional punishment of banishment, but it did resemble the traditional punishments of parole and shaming; accordingly, this factor weighed in favor of finding that the 2021 SORA constituted punishment. The second factor also weighed toward a finding that the 2021 SORA constituted punishment because the 2021 SORA imposed significant obligations on registrants by requiring the immediate disclosure of extensive personal information, annual (or more-frequent) in-person visits to law enforcement, and the payment of fees; the 2021 SORA ensured compliance with these requirements through the potential for imprisonment. With regard to the third factor, the analysis in *Betts* was adopted in full; the purpose of the 2021 SORA was to deter future criminal sexual acts, and the 2021 SORA supported the traditional penological goal of retribution. The fourth factor asks only if the Legislature's decision is rational, not whether it is the most narrowly tailored decision or the most effective method to achieve the nonpunitive goal. Given that low bar, the inclusion of non-sexual offenses in SORA was rationally related to SORA's nonpunitive purpose of protecting the public against persons who pose a danger to the community. Finally, the restraints the 2021 SORA imposed on non-sexual offenders were excessive. The question was whether the 2021 SORA was a reasonable means of protecting the public from the commission of future criminal sexual acts by non-sexual offenders. SORA's efficacy in relation to sex offenders was not necessarily relevant to its efficacy in relation to non-sexual offenders. The 2021 SORA branded non-sexual offenders as dangerous sex offenders even though their crimes contained no sexual component and even though there had been no determination that they posed such a risk of harm to the community. The resultant social stigma of being a sex offender might affect these offenders' ability to acquire and maintain housing and employment and to participate as a member of the community. Further, as a result of their non-sexual crimes, these offenders were subject to extensive law-enforcement supervision through the requirement that they immediately update law enforcement whenever potentially frequent life changes occur, and they were also subject to other collateral consequences, including the affixation of conspicuous identifiers to passports and the potential for exclusion from public housing. The final step in the *Mendoza-Martinez* inquiry was to determine whether defendant demonstrated by "the clearest proof" that the 2021 SORA was so punitive either in purpose or effect as to negate the state's intention to deem it civil. In this case, defendant met that burden. Although the 2021 SORA bore a rational relation to its nonpunitive purpose and the Legislature has continued to express its intention that SORA constitute a civil regulation, SORA resembled traditional methods of punishment, promoted the traditional aims of punishment, and

imposed affirmative restraints that were excessive as applied to non-sexual offenders. Accordingly, the 2021 SORA constituted punishment as applied to non-sexual offenders.

4. A determination of whether a punishment is cruel or unusual focuses on whether the punishment is grossly disproportionate. To evaluate whether a punishment is grossly disproportionate, a reviewing court must consider four factors: (1) the harshness of the penalty compared to the gravity of the offense; (2) the penalty imposed for the offense compared to the penalties imposed for other offenses in Michigan; (3) the penalty imposed for the offense in Michigan as compared to the penalty imposed for the same offense in other states; and (4) whether the penalty imposed advances the goal of rehabilitation. In this case, regarding the first factor, defendant was not personally or morally responsible for having committed a sex offense, but SORA treated him as if he were. The penalty of being subject to the sex-offender registry for a non-sexual crime, imposed in addition to defendant's prison sentence for the non-sexual crime committed, was excessive in comparison to the offense committed and so weighed in favor of a conclusion of gross disproportionality. As to the second factor, the comparison of defendant's non-sexual offenses to more-severe sexual offenses that resulted in a similar penalty and to similar non-sexual offenses that resulted in less-severe penalties supported a conclusion that the punishment imposed by the application of SORA to a non-sexual offender was grossly disproportionate. Regarding the third factor, Michigan is in the majority of jurisdictions insofar as it includes certain non-sexual offenses within its sex-offender-registry law, and so this factor supported a determination that defendant's punishment was not grossly disproportionate. Finally, the fourth factor supported a determination that defendant's punishment was grossly disproportionate because application of SORA to non-sexual offenders did not support the goal of rehabilitation. Altogether, consideration of these factors supported the conclusion that the 2021 SORA constituted cruel or unusual punishment as applied to non-sexual offenders.

Court of Appeals opinion vacated insofar as its conclusions went beyond the consideration of non-sexual offenders; Court of Appeals judgment that defendant and other offenders whose crimes lacked a sexual component are entitled to removal from the sex-offender registry affirmed.

Justice ZAHRA, joined by Justice VIVIANO, dissenting, would have held that SORA's requirement of registration for offenders who kidnap or imprison children was not punishment and, furthermore, was neither cruel nor unusual punishment in violation of the Michigan Constitution. The overwhelming majority of states and the federal government have chosen to include offenders who kidnap or imprison children on public registries; those crimes are highly associated with other forms of sexual and child abuse, which cause significant long-term injury and are severely underreported. The majority misapplied precedent from the United States Supreme Court on the distinction between civil measures and criminal punishment. The question whether modern sex-offender registries constituted criminal punishment was answered in *Smith v Doe*, 538 US 84 (2003), which held that a public registry was not punishment but instead was a civil measure designed to provide public protection. The *Smith* Court applied the *Mendoza-Martinez* factors in reaching this conclusion, and the reasoning in *Smith* applies directly to the federal Sex Offender Registration and Notification Act (SORNA) and registries like Michigan's SORA that were modelled off of, and are almost identical to, SORNA. With regard to the determination of whether a law is so punitive either in purpose or effect as to negate the state's intention to deem it civil, *Smith* held that the effects of the law must be so significant as to override

the Legislature's stated civil intent as equivalent to a "sham," "pretext," or "disguise"—a conclusion that requires "the clearest proof" that the statute can only be considered punitive. Requiring SORA registration for offenders who kidnap or imprison children reasonably advanced a rational, nonpunitive purpose—the goal of public knowledge and protection. Further, the majority's analysis in this case heavily relied on *Betts*, and the reasoning of *Betts* was deeply flawed and conflicted with *Smith*. *Betts* was a massive departure from established jurisprudence. Importantly, SORA is a truthful, public record of registrants' public convictions; it allows Michigan residents to make informed decisions about how they lead their lives. Considering the punishment for criminal behavior similar to that committed by defendant in Michigan and across the country, and considering the public interest advanced by registration, there is no support for the conclusion that a 15-year registration requirement for defendant's criminal behavior as a mature adult is cruel or unusual. The majority's reasoning took direct aim at the civil and public-safety rationale of all registries, and its decision massively lowered the bar for demonstrating constitutionally inhumane treatment.

# OPINION

Chief Justice:
  Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 29, 2024

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee/Cross-
        Appellant,

v                               No. 164685

CORA LADANE LYMON, also known as
COREY LYMON,

        Defendant-Appellant/Cross-
        Appellee.

BEFORE THE ENTIRE BENCH

CLEMENT, C.J.

Defendant challenges his inclusion on the sex-offender registry under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*., as cruel or unusual punishment under the Michigan Constitution. We hold that the application of SORA to non-sexual offenders like defendant is cruel or unusual punishment in violation of the Michigan

Constitution. Accordingly, we affirm the judgment of the Court of Appeals but vacate its opinion to the extent that it is inconsistent with our reasoning.

## I. THE CONTINUING EVOLUTION OF SORA

When the Michigan Legislature enacted SORA in 1994, the sex-offender registry was a "confidential database accessible only to law enforcement" that "required persons convicted of certain sex offenses to register and notify law enforcement of address changes." *People v Betts*, 507 Mich 527, 533; 968 NW2d 497 (2021). In the years since, the Legislature's repeated amendments of SORA transformed it into a publicly accessible registry that restricted registrants' movements and required registrants to regularly report various life details and changes to law enforcement in person. *Id*. at 534-536.

In 2021, this Court was asked whether the retroactive application of SORA, as amended by 2011 PA 17 and 2011 PA 18 (the 2011 SORA), imposed increased punishment on defendants, thus violating constitutional ex post facto protections. *Id*. at 533. This Court concluded that it did. *Id*. Although this Court concluded that the Legislature had likely intended the 2011 SORA as a civil remedy rather than a criminal punishment, this Court further concluded that the statute was so punitive in effect that the 2011 SORA constituted criminal punishment despite that legislative intent. *Id*. at 549-562. In assessing the punitive effects of the 2011 SORA, this Court emphasized several particularly onerous facets of the 2011 SORA, including the student-safety zones that prohibited registrants from residing, living, loitering, or working within 1,000 feet of a school, MCL 28.733 to MCL 28.736, as amended by 2005 PA 121; the immediate reporting requirements that forced registrants to report in person to law enforcement upon potentially frequent life

changes, MCL 28.727, as amended by 2011 PA 18, and MCL 28.725(1), as amended by 2011 PA 17; the calculation of reporting duration being based on an offender's conviction rather than an individualized assessment of the risk a particular offender posed to the community, MCL 28.722(k) and MCL 28.722(s) through (u), as amended by 2011 PA 17; and the publication of an offender's tier status on the public website, MCL 28.728(2)(*l*), as amended by 2011 PA 18. *Id*. Ultimately, this Court held that the 2011 SORA could not be constitutionally applied to registrants whose criminal acts subjecting them to registration occurred before the enactment of the relevant statutory amendments. *Id*. at 573-574.[1]

As this Court was considering the ex post facto challenge in *Betts*, the Legislature enacted 2020 PA 295, effective March 24, 2021 (the 2021 SORA).[2] The 2021 SORA implemented various ameliorative provisions, including: removing the student-safety-zone prohibitions; no longer categorizing assignments under the Holmes Youthful Trainee Act, MCL 762.16 *et seq*., as registrable offenses, MCL 28.722(a)(*ii*); no longer categorizing expunged convictions as registrable offenses, MCL 28.722(a)(*i*); removing registrants' tier classification from the public website, MCL 28.728(3)(e); adding a requirement that the failure to register be a "willful[]" failure to comply, MCL 28.729(2); and providing that the Michigan State Police may create means other than in-person reporting by which registrants provide immediate information updates to law enforcement, MCL 28.725(1) and (2). The legislation also implemented other and potentially more-onerous changes,

---

[1] The United States Court of Appeals for the Sixth Circuit reached a similar conclusion in *Does #1-5 v Snyder* (*Does I*), 834 F3d 696 (CA 6, 2016).

[2] Although the 2021 SORA was in effect at the time that this Court issued its opinion in *Betts*, *Betts* addressed only whether the 2011 SORA constituted punishment and did not offer any analysis as to the 2021 SORA. *Betts*, 507 Mich at 533 n 2, 566 n 24.

3

including requiring registrants to report to law enforcement all "internet identifiers"—i.e., "all designations used for self-identification or routing in internet communications or posting." MCL 28.725(2)(a); MCL 28.722(g). (Previously, a registrant was required to report "any electronic mail or instant message address, or any other designations used in internet communications or postings." See MCL 28.725(1)(f), as amended by 2011 PA 17.)

Since these new changes to SORA and this Court's decision in *Betts* have come new legal challenges to SORA's application, including defendant's present challenge.[3]

## II. FACTS AND PROCEDURAL HISTORY

Defendant's sentence requiring his placement on the sex-offender registry arises from his violent confrontation of his then wife, Jacqueline Lymon, regarding an alleged affair. Both of their minor children—sixteen-year-old IL and fifteen-year-old SL—were present during the confrontation.

During the initial confrontation, Jacqueline challenged defendant's claim that he had proof she was having an affair. Defendant stated that he had text messages on his phone proving the claim but then slammed his phone into the table, breaking the phone. Defendant briefly left the house to have the phone repaired, and when he returned, the argument resumed.

---

[3] These challenges have arisen both in our state courts and in the federal courts. See *Does v Whitmer* (*Does III*), opinion and order of the United States District Court for the Eastern District of Michigan, issued April 19, 2023 (Case No. 22-CV-10209) (presenting several legal challenges to the 2021 SORA).

4

Jacqueline eventually informed defendant that she wanted to end their marriage. Defendant called her a "cold-hearted bitch" and a "whore." He then retrieved a handgun from the pantry, chambered a round, and aimed the handgun at Jacqueline. IL attempted to intervene by standing in front of Jacqueline in the line of fire, but defendant did not move the handgun and instead responded, "[W]ell, you can get it, too." SL attempted to call the police, but defendant took SL's and IL's phones.

While continuing to hold his family at gunpoint, defendant forced Jacqueline and the children to move to the sofa in the family room. Defendant stated that if he killed Jacqueline, he would have to kill his children as well. Jacqueline and the children begged, pleaded, and prayed for their lives. At some point, they began screaming at full volume, hoping that it would draw the attention of their neighbors. Defendant forced them to kneel in front of the fireplace and again stated his intention to kill them. When Jacqueline prompted him to think about God and told him angels were there to protect her and the children, defendant responded, " 'F' God," and that she was "gonna see angels. . . . [Y]ou're gonna see a lot of angels in a minute." Defendant then raised the handgun and stated, "[T]his is it."

However, instead of shooting his family, defendant separated Jacqueline from the children and forced her to sit on the sofa next to him. He continued raving about killing his family, again stating that he would have to kill the children if he killed Jacqueline and also remarking that he was going to do "demonic . . . shit" and "burn this thing down after I, I kill you all." Defendant insulted and interrogated Jacqueline while aiming the handgun at her side, and whenever her responses were not to his satisfaction, he would hit her in the back of the head. When SL told defendant to stop, defendant aimed the handgun at SL and

5

asked what SL was going to do about it. At some point, defendant put the handgun in his mouth and told his family to pull the trigger. No one acquiesced.

When defendant briefly left the family room, IL fled from the home. However, defendant instructed Jacqueline to retrieve him, indicating that he would kill SL if she did not successfully do so. IL had stopped his escape at the end of the driveway out of concern about what would happen to Jacqueline and SL, and so Jacqueline was able to catch up to him and convince him to return to the house.

After their return, defendant continued to threaten suicide. His family told him not to, stated that they loved him, and asked him to calm down. This appeared to somewhat calm defendant, who set the handgun down on a nearby table and allowed the family to sit on the sofa. However, defendant did not permit anyone to leave the room. When the children needed to use the bathroom, he instructed them to urinate against the wall or in a cup and remarked that he was going to "burn it down anyway." Near midnight, IL was able to retrieve his phone and briefly go upstairs before defendant ordered him to return. But IL did not call the police, afraid of what defendant would do to them if the police arrived.

Defendant kept his family in the family room in this state until morning. Then, defendant apologized. His children told him that he had just had a bad night and that they would forget about it. Defendant drove one child to work and again apologized for his actions. When defendant returned to the house, he apologized to the rest of the family. Defendant allowed Jacqueline to go to work, and later that day, she retrieved both children and filed a police report.

Defendant was charged and convicted of three counts of torture, three counts of unlawful imprisonment, one count of felonious assault, and one count of possession of a firearm during the commission of a felony (felony-firearm).[4] The trial court sentenced defendant to 126 to 240 months' imprisonment for the torture convictions, 84 to 180 months' imprisonment for the unlawful-imprisonment convictions, 24 to 48 months' imprisonment for the felonious-assault conviction, and to a consecutive two years' imprisonment for the felony-firearm conviction. Because two of the three unlawful-imprisonment convictions involved minors, the trial court also required defendant to register as a Tier I sex offender under SORA. See MCL 28.722(q) and (r)(*iii*). As a Tier I offender, defendant must comply with the requirements imposed by SORA for 15 years. MCL 28.725(11). However, "any period of incarceration for committing a crime" is not counted toward this 15-year period. MCL 28.725(14).

Defendant appealed. After his case was held in abeyance for several years for the resolution of related cases in this Court,[5] the Court of Appeals issued a published decision affirming defendant's convictions but remanding for the entry of an order removing

---

[4] The jury acquitted defendant of three counts of interfering with the reporting of a crime and two counts of felonious assault.

[5] Defendant's appeal was originally held in abeyance for the resolution of the defendant's application for leave to appeal in this Court in *People v Bosca*, 310 Mich App 1; 871 NW2d 307 (2015). But this Court held that application in abeyance for the resolution of several other related cases, including *People v Temelkoski*, 501 Mich 960 (2018), *People v Tucker*, 503 Mich 854 (2018), and *People v Snyder*, 508 Mich 948 (2021). See *People v Bosca*, 872 NW2d 492 (2015); *People v Bosca*, 911 NW2d 465 (2018). Finally, this Court reversed the *Bosca* Court of Appeals decision in part and remanded for further proceedings that were consistent with *Betts*. *People v Bosca*, 509 Mich 851 (2022). The Court of Appeals resumed consideration of this case thereafter.

defendant from the sex-offender registry. *People v Lymon*, 342 Mich App 46, 88-89; 993 NW2d 24 (2022). The Court concluded that imposition of the 2021 SORA for a crime that lacks a sexual component constituted cruel or unusual punishment. *Id*.

Defendant subsequently sought leave to appeal in this Court regarding the affirmance of his convictions, and the prosecution cross-appealed regarding the removal of defendant from SORA. This Court granted the prosecution's cross-application and directed oral argument as to

> whether requiring a defendant to register as a sex offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*., as amended by 2020 PA 295, effective March 24, 2021 (the 2021 SORA), for a non-sexual crime, such as unlawful imprisonment of a minor, constitutes cruel or unusual punishment under Const 1963, art 1, § 16 or cruel and unusual punishment under US Const, Am VIII. [*People v Lymon*, 511 Mich 860, 860 (2023).]

### III. CRUEL OR UNUSUAL PUNISHMENT

Defendant argues that the imposition of the 2021 SORA requirements on non-sexual offenders violates the Michigan Constitution's prohibition of cruel or unusual punishment.[6] This Court reviews questions of constitutional law de novo. See *People v Kennedy*, 502 Mich 206, 213; 917 NW2d 355 (2018). Statutes are presumed to be constitutional, and the

---

[6] Defendant has consistently argued that the 2021 SORA constitutes cruel or unusual punishment as applied to defendant himself or as applied more generally to non-sexual offenders. Accordingly, our analysis and decision concerns only whether the application of the 2021 SORA to non-sexual offenders like defendant constitutes cruel or unusual punishment. We leave for another day and case whether the 2021 SORA constitutes punishment—and, more specifically, cruel or unusual punishment—when applied to other offenders. To the extent that the Court of Appeals decision in this case determined that the 2021 SORA constitutes punishment as to all defendants, we vacate that conclusion.

party challenging the statute has the burden of showing to the contrary. See *People v Sands*, 261 Mich App 158, 160; 680 NW2d 500 (2004).

The Michigan Constitution provides that "cruel or unusual punishment shall not be inflicted[.]" Const 1963, art 1, § 16.[7] Because this provision prohibits cruel or unusual "punishment," we will first assess whether the penalty at issue is a criminal punishment or a civil regulation, see *People v Betts*, 507 Mich 527, 542-543; 968 NW2d 497 (2021),[8] and

---

[7] The parallel provision in the federal Constitution provides that the government shall not inflict "cruel *and* unusual punishments." US Const, Am VIII (emphasis added). This Court has previously recognized that the Michigan Constitution's use of "or" rather than "and" provides additional protection beyond its federal counterpart, as it prohibits punishments that are cruel, even if they are not unusual, *and* prohibits punishments that are unusual, even if they are not cruel. See *People v Bullock*, 440 Mich 15, 32-33; 485 NW2d 866 (1992); *People v Parks*, 510 Mich 225, 242; 987 NW2d 161 (2022). Because the Michigan Constitution offers more protection to defendant, we need not analyze his claims independently under the federal Constitution.

[8] Amicus the American Civil Liberties Union (ACLU) argues that this Court need not perform this initial analysis whether the 2021 SORA constitutes a "punishment." It further asserts that the initial analysis whether a statute constitutes "punishment" is only appropriate and has only been used by this Court in the context of ex post facto arguments, as in *Betts*, and not in the context of arguments concerning the cruel-or-unusual-punishment provision of the Michigan Constitution.

Amicus ACLU is correct that this Court has not previously employed this initial analysis in the context of cruel-or-unusual-punishment arguments. But the parties here, as well as the lower courts, have all applied the initial "punishment" inquiry in evaluating defendant's arguments. Moreover, while some support exists for amicus ACLU's proposition, see, e.g., *Austin v United States*, 509 US 602, 610 & n 6; 113 S Ct 2801; 125 L Ed 2d 488 (1993), many other state and federal courts have more recently applied the initial "punishment" inquiry in assessing similar cruel-or-unusual-punishment arguments, see, e.g., *In re TB*, 489 P3d 752, 765; 2021 CO 59 (Colo, 2021); *In re TH*, 913 NW2d 578, 587 (Iowa, 2018); *State v Petersen-Beard*, 304 Kan 192, 194; 377 P3d 1127 (2016); *Doe v Settle*, 24 F4th 932, 945-946 (CA 4, 2022); *Millard v Camper*, 971 F3d 1174, 1181 (CA 10, 2020). Finally, assuming that an alternative analysis would be less stringent than the initial "punishment" inquiry applied here, the result of our analysis would not change

then, if it is a punishment, whether that punishment is cruel or unusual, see *People v Bullock*, 440 Mich 15, 35; 485 NW2d 866 (1992). We address each argument in turn.

### A. WHETHER THE 2021 SORA CONSTITUTES PUNISHMENT

To determine whether a statute constitutes punishment, this Court engages in a two-step inquiry. *People v Earl*, 495 Mich 33, 38; 845 NW2d 721 (2014). First, this Court must determine "whether the Legislature intended the statute as a criminal punishment or a civil remedy." *Id*. If the statute imposes a disability for the purpose of reprimanding the wrongdoer, the Legislature likely intended the statute as a criminal punishment. *Id*. at 38-39. However, if the statute imposes a disability to further a legitimate governmental purpose, the Legislature likely intended the statute as a civil remedy. *Id*. at 39.

If this Court determines that the Legislature intended the statute as criminal punishment, then this Court must conclude that the statute is indeed punishment. *Id*. at 38-39. However, if this Court determines that the Legislature intended the statute as a civil remedy, this Court must then consider "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id*. at 38 (quotation marks, citation, and brackets omitted). However, the Legislature's intent will be rejected only when "a party challenging the statute provides the *clearest proof* that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Kansas v Hendricks*, 521 US 346, 361; 117 S Ct 2072; 138 L Ed 2d 501 (1997) (quotation marks, citation, and brackets omitted; emphasis added).

---

because we ultimately conclude that defendant has satisfied the "punishment" inquiry outlined in *People v Earl*, 495 Mich 33, 38; 845 NW2d 721 (2014).

The United States Supreme Court has provided the following nonexhaustive factors to guide courts in their consideration of the punitive purpose or effect of a statute:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . . [*Kennedy v Mendoza-Martinez*, 372 US 144, 168-169; 83 S Ct 554; 9 L Ed 2d 644 (1963) (citations omitted). See also *Earl*, 495 Mich at 43-44 (adopting these factors).]

In the context of the constitutionality of sex-offender-registry statutes, the United States Supreme Court and this Court have identified the following five of these seven factors as having particular relevance: (1) whether the statute has historically been regarded as punishment; (2) whether the statute imposes an affirmative disability or restraint; (3) whether the statute promotes the traditional aims of punishment; (4) whether the statute has a rational connection to a nonpunitive purpose; and (5) whether the statute is excessive with respect to its nonpunitive purpose. See *Smith v Doe*, 538 US 84, 97; 123 S Ct 1140; 155 L Ed 2d 164 (2003); *Betts*, 507 Mich at 549-562.

## 1. LEGISLATIVE PURPOSE

Regarding first whether the Legislature intended the 2021 SORA as a civil regulation or a criminal punishment, *Earl*, 495 Mich at 38, we adopt our reasoning from *Betts*, 507 Mich at 548-549, to conclude that the Legislature intended the 2021 SORA as a civil regulation. In *Betts*, this Court stated:

> When the Legislature amended SORA in 2002, it included the following statement:

11

The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger. [MCL 28.721a.]

This description indicates that the Legislature's intent in enacting SORA was the promotion of public safety, a nonpunitive goal. Further, SORA is codified in Chapter 28 of the Michigan Compiled Laws rather than Chapter 750, the Michigan Penal Code. However, other aspects of SORA suggest a punitive intent. Although MCL 28.721a describes the Legislature's intent as the promotion of public safety, it does so by seeking to deter future crimes, a traditional penological aim. Further, SORA requirements are imposed as a consequence of a criminal conviction, its requirements are enforced by law enforcement, and violations of its requirements are punishable by criminal conviction. Weighing these characteristics against the Legislature's expression of its intent in MCL 28.721a, we conclude that the Legislature likely intended SORA as a civil regulation rather than a criminal punishment. [*Betts*, 507 Mich at 548-549.]

Although the present case concerns the 2021 SORA and not the 2011 SORA that was at issue in *Betts*, our previous analysis is largely unaffected by the recent changes to SORA. When the Legislature enacted 2020 PA 295, the Legislature did not amend its statement of intent in MCL 28.721a, nor did it amend the statute in any other way that would imply that its intent in enacting the statute had changed. To the contrary, the Legislature's choice to remove provisions this Court identified in *Betts* as especially punitive in effect supports a theory that the Legislature's recent amendments were made to support a characterization

of SORA as civil. Accordingly, we conclude that the Legislature intended the 2021 SORA as a civil regulation.

## 2. PUNITIVE EFFECTS

Because we conclude the Legislature intended to impose a regulatory remedy in enacting SORA, this Court must now consider "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Earl*, 495 Mich at 38 (quotation marks, citation, and brackets omitted). We consider each relevant *Mendoza-Martinez* factor in turn. See *Smith*, 538 US at 97; *Betts*, 507 Mich at 549-562.[9]

## a. HISTORY AND TRADITION

This *Mendoza-Martinez* factor asks this Court to consider whether SORA has "been regarded in our history and traditions as a form of punishment." *Earl*, 495 Mich at 45. As we recognized in *Betts*, 507 Mich at 550, "[s]ex-offender registries are of relatively recent origin and so have no direct analogies in this nation's history and traditions." See also *Smith*, 538 US at 97. But although no direct analogy exists, sex-offender-registry laws may still resemble traditional punishments. See *Betts*, 507 Mich at 550; *Smith*, 538 US at 97.[10]

---

[9] The following analysis derives from this Court's decision in *Betts*. Accordingly, much of the dissent's disagreement with this analysis—nearly half of its page length, proportionally—consists of criticism of *Betts* itself. We, of course, disagree that this Court in *Betts* "for all intents and purposes ignored *Smith*," engaged in "gratuitous" analysis, "completely avoid[ed] the primary justification for registries," or "all but announc[ed] this Court's policy preferences." *Betts* reasonably applied the *Mendoza-Martinez* factors to a sex-offender registry (and society) that was demonstrably different than the one at issue decades earlier in *Smith* to determine that the cumulative punitive effects of the registry outweighed the Legislature's rational civil intent in enacting it. We decline to engage further with these criticisms that have already been raised and answered in *Betts*.

[10] The dissent claims that we "totally ignore[] the fact that registries are of recent origin, thereby weighing *against* the conclusion that registries are akin to 1700s punishments."

13

In *Betts*, this Court determined that the 2011 SORA resembled the traditional punishments of banishment, shaming, and parole. *Betts*, 507 Mich at 550-553. However, this Court's analysis regarding the 2011 SORA's resemblance to banishment was entirely premised on the 2011 SORA's student-safety zones, which prohibited registrants from living, residing, working, or loitering within 1,000 feet of a school. *Id.* at 550-551. As discussed earlier, the 2021 SORA removed these provisions and did not enact any additional rules restricting registrants' movements, and so SORA no longer bears this resemblance to banishment.[11]

Despite the recent amendments, however, the 2021 SORA continues to resemble the traditional punishments of parole and shaming. Regarding the former, registrants, like parolees, are subject to various requirements and supervision because of their criminal convictions. MCL 28.724. Registrants are required to report in person to law enforcement one to four times per year, depending on their tier classification. MCL 28.725a(3). Registrants must also report to law enforcement the following changes within three business days: a change of domicile or residence; a change of employment status;

Above, we clearly acknowledge that sex-offender registries are of recent origin and so have no perfect analogies to traditional punishments. However, like the Sixth Circuit Court in *Does I*, 834 F3d at 701-703, we acknowledge that analogies may still be made between traditional punishments and more recent statutory enactments (while identifying any weaknesses in those analogies as well). If the modernity of any statutory enactment is weighed so heavily against similarity to traditional punishments, few—if any—modern penalties could prove punitive under this factor.

[11] To the extent that the dissent might imply that we conclude that registries resemble all forms of historical punishment, we would emphasize that although we conclude that SORA resembles shaming and parole, we conclude that SORA no longer resembles banishment because its present iteration no longer includes a prohibition on registrants living, working, or loitering within 1,000 feet of school property.

14

enrollment or disenrollment in a higher-education institution; a name change; changes in vehicle information, e-mail addresses, Internet identifiers, and telephone numbers registered to or used by the registrant; and the intent to reside temporarily elsewhere for more than seven days. MCL 28.725(1) and (2). The frequency of these life changes may result in registrants being required to contact law enforcement as much as—or more regularly than—the average parolee. Registrants must also pay a yearly fee. MCL 28.725a(6). The failure to comply with these and other requirements, like the failure to comply with parole conditions, potentially subjects the offender to imprisonment. MCL 28.729(1). Moreover, "as with parole, a law enforcement officer at any time could . . . investigate[] a registrant's status based on an anonymous tip." *Betts*, 507 Mich at 553. Accordingly, SORA continues to impose substantial law-enforcement oversight and interaction on registrants, similar to that of parole.

We recognize, as the prosecution argues, that the changes wrought by 2020 PA 295 have eliminated previous restrictions imposed on registrants by earlier versions of SORA. Specifically, with the removal of the student-safety provisions, SORA no longer renders registrants "not free to live and work where they desire[] . . . ." *Id*. at 553. Accordingly, although registrants must provide detailed information to law enforcement, their choices are no longer restricted by SORA's requirements. The changes implemented by 2020 PA 295 have also affected the type of supervision imposed on registrants. The immediate change-based updates described in MCL 28.725(1) and (2) may now be made either in person or in a manner set forth by the Michigan State Police, which has since established a mail-in option for those updates. This decreases the in-person interactions between law enforcement and registrants and decreases the financial and logistical burden placed on

15

registrants by these requirements.  Ultimately, while we acknowledge that these changes have weakened the analogy between parole and sex-offender registration, we find the remaining similarities sufficient to find a persuasive resemblance between the two.

Next, the 2021 SORA also continues to resemble the traditional punishment of shaming.  Although a registrant's tier classification is no longer required to appear on the public-facing sex-offender-registry website, substantial personal information of each registrant is available to the public.  Further, members of the public may choose to be notified whenever any registrant moves into a particular zip code.  MCL 28.730(3).  As we previously reasoned:

> While the initial version of SORA might have been "more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality," *Smith*, 538 US at 99, its [current] iteration contain[s] more personal information and require[s] less effort to access that information.  The public-facing registry contain[s] not only information regarding a registrant's criminal conviction but also the registrant's home address, place of employment, sex, race, age, height, weight, hair and eye color, [and] discernible features . . . .  When SORA's notification provision [is] used, members of the public [are] alerted to this information without active effort on their behalf, in sharp contrast with the endeavor of visiting an official archive for information.  Further, a registrant's information could precede his entrance into a community, increasing the likelihood of ostracism.  MCL 28.721a itself—the Legislature's statement of its intent in enacting SORA— refers to providing the public, not just law enforcement, with the means to monitor persons with sex-offense convictions, encouraging public participation and engagement with the registry and furthering the stigma of registration.  See *Doe* [*v State*], 167 NH [382,] 406[; 111 A3d 1077 (2015)] ("Placing offenders' pictures and information online serves to notify the community, but also holds them out for others to shame or shun."). . . . [H]owever, the [current] SORA does not perfectly resemble the traditional punishment of shaming.  See *Smith*, 538 US at 97-98 (describing traditional shaming punishments such as requiring offenders to stand in public with signs describing their crimes or branding offenders in order to inflict permanent stigma).  The [current] SORA [does] not provide a conduit for the

16

public to directly criticize and shame registrants—as it would have, for example, if it provided an online forum or area for comments in addition to the online registry. [*Betts*, 507 Mich at 551-552.][12]

Moreover, as applied to offenders like defendant whose crimes—while heinous—did not include a sexual component, the 2021 SORA provides an additional element of shaming by branding these registrants with the label of "sex offender." These registrants are placed on the Michigan Sex Offender Registry in an effort to "prevent[] and protect[] against the commission of future criminal sexual acts by convicted sex offenders," MCL 28.721a, and face the accordant social stigma and community judgment of being a sex offender despite the fact that their crimes did not include a sexual component. The 2021 SORA, contrary to the dissent's assertion, does more than "merely serve to provide accurate information to average citizens to make decisions about their lives"; it imposes the label of "sex offender" with its attendant consequences on non-sexual offenders and imposes various reporting and financial requirements. As we previously acknowledged in *Betts*, 507 Mich at 547, sex-offender registries and their effects have expanded beyond the sex-offender-registry scheme at issue in *Smith* that was equated to "a visit to an official archive of criminal records," *Smith*, 538 US at 99, especially given the rising and pervasive influence of the Internet since the *Smith* decision in 2003.

In sum, we conclude that although the 2021 SORA no longer resembles the traditional punishment of banishment, it continues to resemble parole and shaming.

---

[12] As with our discussion of the 2021 SORA's resemblance to the traditional punishment of parole, we note that 2020 PA 295 also implemented an ameliorative amendment in the context of the 2021 SORA's resemblance to shaming. Specifically, 2020 PA 295 provides that a registrant's tier classification shall not be included on the public website. MCL 28.728(3)(e).

Accordingly, this factor weighs in favor of finding that the 2021 SORA constitutes punishment.

## b. AFFIRMATIVE DISABILITY OR RESTRAINT

Next, this Court must consider "how the effects of" the 2021 SORA "are felt by those subject to it." *Smith*, 538 US at 99-100. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id*. at 100.

Assessing this factor necessitates identifying the requirements that the 2021 SORA imposes on registrants. Under the 2021 SORA, a registrant must appear in person to establish their initial registration and must also pay an initial $50 fee. MCL 28.725a; MCL 28.727. Depending on tier classification, the registrant must thereafter appear in person once per year (Tier I), twice per year (Tier II), or four times per year (Tier III) to verify or update their initial registration information. MCL 28.725a. The first time that a registrant appears in person to law enforcement for this annual reporting, the registrant must also pay an annual fee. MCL 28.725a(6)(b). These in-person reports "impose[] a burden on registrants, especially for those who might have . . . difficulty traveling to make the reports—such as those who d[o] not have access to public transportation, d[o] not have the financial resources necessary for private or public transportation, or ha[ve] health or accessibility issues that [may] impede[] transportation." *Betts*, 507 Mich at 556.

Thereafter, upon numerous life changes—including a change of domicile or residence; a change of employment status; enrollment or disenrollment in a higher-education institution; a name change; changes in vehicle information, e-mail addresses, Internet identifiers, and telephone numbers registered to or used by the registrant; and the

18

intent to reside temporarily elsewhere for more than seven days—the registrant must inform law enforcement of their updated information within three days either in person or by an alternative method established by the Michigan State Police. MCL 28.725(1) and (2). The life changes that require a registrant to report to law enforcement within three days are numerous and could occur multiple times in a single calendar year. Specifically concerning the reporting requirement of changes to Internet identifiers, "[g]iven the ubiquity of the Internet in daily life, this requirement might [be] triggered dozens of times within a year." *Betts*, 507 Mich at 555.[13] Reporting requirements regarding changes to vehicle information, telephone numbers, or residences might similarly be triggered multiple times in a year, especially for those registrants who face frequent life changes because of the lack of financial stability or other circumstances. Registrants must adhere to these requirements as well as the annual (or more-frequent) in-person reporting and registration payment requirements for at least 15 years and sometimes for life. MCL 28.725(11) through (13). These requirements are also based solely on a registrant's conviction and not on any individualized assessment of the risk a specific registrant poses to the public. See *State v Hinman*, 412 Mont 434, 446; 2023 MT 116; 530 P3d 1271 (2023) ("The effect [of similar requirements] is a considerable sacrifice of privacy and a permanent system of state surveillance.").

---

[13] Notably, these updates were formerly required via in-person reporting, and the 2021 SORA now allows the Michigan State Police to designate alternative means of such reporting—which it has, via first-class mail. Of course, first-class mail is not without its detriments (e.g., postage and envelope costs and acquisitions, timing, and potential reliability concerns), and nothing in the 2021 SORA prevents the Michigan State Police from rescinding this alternative update method.

19

Compliance with these requirements is enforced through the threat of imprisonment. MCL 28.729(1) (providing that a registrant who willfully violates a requirement is generally guilty of a felony, punishable by either 4, 7, or 10 years' imprisonment).[14] Any violation of SORA also results in the revocation of probation, parole, or youthful-trainee status. MCL 28.729(5) through (7).

We must also consider the effects of having a registrant's registration publicly available online. This publication might result in the reduction of both housing and employment opportunities as companies desire to avoid association with registrants to avoid harm to the companies' public image. See *Wallace v State*, 905 NE2d 371, 380 (Ind, 2009) (noting that the sex-offender registry could subject registrants to " 'vigilante justice' which may include lost employment opportunities, housing discrimination, threats, and violence").

Overall, the 2021 SORA continues to impose significant obligations on registrants by requiring the immediate disclosure of extensive personal information, annual (or more-frequent) in-person visits to law enforcement, and the payment of fees. The 2021 SORA ensures compliance with these requirements through the potential for imprisonment, which is the paradigmatic affirmative restraint. See *Smith*, 538 US at 100. Accordingly, this factor weighs toward a finding that the 2021 SORA constitutes punishment—although it weighs less heavily in that regard than the 2011 SORA, which additionally restricted

---

[14] MCL 28.729(2), (3), and (4) identify a few specific violations as misdemeanors punishable by lesser terms of imprisonment.

20

registrants' choices and actions through student-safety zones and imposed more-frequent in-person reporting requirements.[15]

## c. TRADITIONAL AIMS OF PUNISHMENT

Next, this Court must consider whether the 2021 SORA promotes the traditional aims of punishment: retribution and specific and general deterrence. *Earl*, 495 Mich at 46. Because the changes to the 2021 SORA have not materially affected this Court's analysis of this factor as to the 2011 SORA, we adopt in full this Court's analysis and conclusion from *Betts*:

> Deterrence is necessarily encompassed by SORA's stated purpose of "preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." MCL 28.721a. The extensive requirements of the 2011 SORA also generally deterred potential offenders by increasing the resultant consequences of sexual predation. Yet the aim of deterrence alone does not render a statute punitive. See *Smith*, 538 US at 102. As the United States Supreme Court has reasoned, "To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation." *Id*. (quotation marks and citation omitted). However, the deterrent effect of the 2011 SORA is not merely an indirect consequence, incidental to its regulatory function, but instead a main feature of the statutory scheme. See MCL 28.721a.
>
> The 2011 SORA also supports the aim of retribution. The 2011 SORA was imposed on offenders for the sole fact of their prior offenses and made no individualized determination of the dangerousness of each registrant, indicating that SORA's restrictions were retribution for past offenses rather than regulations to prevent future offenses. See *Smith*, 538

---

[15] Although none of these restraints, imposed individually, would likely support a conclusion that the statute imposes significant affirmative restraints, we consider all the 2021 SORA provisions and their punitive effect on registrants cumulatively. See *Smith*, 538 US at 92, 94, 96-97, 99, 104-105; *Doe*, 167 NH at 402 (holding that the punitive-effect "inquiry cannot be answered by looking at the effect of any single provision in the abstract") (quotation marks and citation omitted).

21

US at 109 (Souter, J., concurring in the judgment) ("The fact that the Act uses past crimes as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones."). [*Betts*, 507 Mich at 556-558.]

As discussed earlier, the amendments of SORA did not affect the manifest intent of the Legislature as expressed in MCL 28.721a; the purpose of the 2021 SORA remains deterrence of future criminal sexual acts. Further, the 2021 SORA did not implement any individualized assessment of risk, and so its requirements continue to be imposed on offenders for the sole fact of their prior offenses. Accordingly, the 2021 SORA also supports the traditional penological goal of retribution.

#### d. CONNECTION TO NONPUNITIVE PURPOSE

Next, this Court must consider whether the 2021 SORA has a rational connection to a nonpunitive purpose. See *Earl*, 495 Mich at 46. A rational connection is all that is required; "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 US at 103.

Recall that MCL 28.721a, the Legislature's statement of intent in enacting SORA, provides as follows:

> The legislature declares that the sex offenders registration act was enacted . . . with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate,

22

comprehensive, and effective means to monitor those persons who pose such a potential danger.

Previously, this Court determined that SORA, "by identifying potentially recidivist sex offenders and alerting the public, seeks to further the nonpunitive purpose of public safety." *Betts*, 507 Mich at 558.

However, here, this Court must additionally ask whether the inclusion of non-sexual offenders furthers the nonpunitive purpose of public safety. As MCL 28.721a indicates, the inclusion of the potentially non-sexual offenses of unlawful imprisonment of a minor, enticement, and kidnapping as listed offenses represents a legislative determination that a person who has been convicted of committing any of those offenses "poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." This conclusion is not unique; legislatures around the country (including our federal Congress) have recognized a nexus between certain non-sexual offenses like unlawful imprisonment of a minor and sexual assault. See, e.g., *People v Johnson*, 225 Ill 2d 573, 590-591; 870 NE2d 415 (2007) (finding rational Illinois's inclusion of kidnapping and unlawful imprisonment of a minor in its sex-offender-registry statute based, in part, on the Illinois General Assembly's determination that these crimes often involve the risk of or commission of sexual assault and might serve as a precursor to later sexual offenses and noting that other states and Congress had passed legislation reflecting similar determinations); *State v Smith*, 323 Wis 2d 377, 401-402; 2010 WI 16; 780 NW2d 90 (2010) (similar).

Again, this *Mendoza-Martinez* factor asks only if the Legislature's decision is rational, not whether it is the most narrowly tailored decision or the most effective method

23

to achieve the nonpunitive goal. See *Smith*, 538 US at 103. Given that low bar, we conclude that the inclusion of non-sexual offenses in SORA is rationally related to SORA's purpose of protecting the public against persons who pose a "potential serious menace and danger" to the community.

### e. EXCESSIVENESS

Finally, this Court must consider whether the 2021 SORA is excessive with respect to its nonpunitive purpose. This *Mendoza-Martinez* factor requires the Legislature to have made a "reasonable" choice; it does not require the Legislature to have "made the best choice possible to address the problem it seeks to remedy." *Smith*, 538 US at 105. As we noted in *Betts*, "The Legislature's asserted nonpunitive goal was based on the Legislature's determination that 'a person who has been convicted of committing an offense covered by [SORA] poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state.' MCL 28.721a." *Betts*, 507 Mich at 559 (alteration by the *Betts* Court). Accordingly, this Court must determine whether the 2021 SORA is a reasonable means of protecting the public from the "commission of future criminal sexual acts" by non-sexual offenders like defendant. MCL 28.721a.[16]

---

[16] We would also recognize that MCL 28.721a describes the relevant legislative intent as "to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts *by convicted sex offenders*." (Emphasis added.) Because defendant is not a sex offender, the connection between his inclusion on the sex-offender registry and "protecting against the commission of future criminal sexual acts by convicted sex offenders" is quite attenuated. However, given that the Legislature also referred to the risk posed to the public by a person who committed a listed offense under SORA, we ascribe a broader purpose to SORA.

The parties' and amici's arguments regarding whether the restrictions imposed by SORA on registrants are excessive in light of SORA's nonpunitive purpose have focused on the efficacy of sex-offender registries generally. Defendant and amici argue that sex-offender registries do not decrease recidivism and might actually increase recidivism rates because of the collateral effects of such registries—e.g., notoriety in the community, unstable housing and employment, and other barriers to reintegration. Defendant and amici also challenge SORA's failure to implement an individualized risk assessment that would account for the allegedly measurable decreases in the risk of recidivism as offenders age.

Previously, in *Betts*, we recognized that "[a] growing body of research" supports similar assertions "that the dangerousness of sex offenders has been historically overblown and that, in fact, sex offenders are actually less likely to recidivate than other offenders," and we concluded that "these studies demonstrate that, at minimum, the 2011 SORA's efficacy is unclear." *Betts*, 507 Mich at 560-561; see also *Does I*, 834 F3d at 704. The same and additional studies continue to support the uncertainty of SORA's general efficacy.[17] Yet, SORA's efficacy in relation to sex offenders is not necessarily relevant to its efficacy in relation to non-sexual offenders like defendant. The parties and amici here have failed to present specific information regarding the risk of the commission of future

---

[17] While in other cases we have recognized when a "clear consensus" exists in the scientific community, see, e.g., *Parks*, 510 Mich at 249, it is not necessary for this Court in this case to determine whether the research defendant and amici present here represents such a "clear consensus."

25

sexual offenses posed by non-sexual offenders and the efficacy of sex-offender registries as applied to these non-sexual offenders.[18]

Nevertheless, despite the uncertainty of SORA's efficacy in general and the uncertainty of SORA's efficacy as applied to non-sexual offenders in particular, we find that the restraints it imposes on non-sexual offenders are excessive. Such offenders are branded dangerous sex offenders even though their crimes contained no sexual component and even though there has been no determination that they pose such a risk of harm to the community. In other words, SORA "treats individuals with absolutely no documented history of any kind of sexual contact with, or attraction to, minors as if they nevertheless pose a significant risk of preying on children unless restrained and supervised . . . ." *Reid v Lee*, 597 F Supp 3d 1177, 1199 (MD Tenn, 2022). Further, "the substantiality of the risk

---

[18] The dissent criticizes us for "cit[ing] *Betts* for the one-sided citation to certain studies that critique registries" and claims that these studies are "totally irrelevant to this Court's inquiry"—but then, later, asserts that scientific literature demonstrates the opposite. If the dissent means to assert that scientific literature is relevant to the excessiveness inquiry but that this majority has endorsed the incorrect literature, we respond that this opinion does not endorse either position regarding the efficacy of sex-offender registries or the recidivism rates of registrants. Instead, we acknowledge the existence of a robust scientific debate and no universally accepted conclusion on the matters. One would have anticipated that the dissent would have approved of this Court's restraint in declining to wade into these matters. See *Parks*, 510 Mich at 292-293 (CLEMENT, J., joined by ZAHRA and VIVIANO, JJ., dissenting) (criticizing the majority's reliance on scientific evidence in reaching its decision). Instead, the dissent endorses its own choice of scientific studies and apparent evaluation of the available literature.

If the dissent instead means to assert that scientific literature is *not* relevant to the excessiveness inquiry, we also disagree. In the excessiveness inquiry, this Court is charged with determining whether a statute is excessive with respect to its nonpunitive purpose. *Smith*, 538 US at 105. Because the nonpunitive purpose of this particular statute is to protect the public against the "commission of future criminal sexual acts," MCL 28.721a, the danger posed by registrants and the efficacy of the statute in curing that danger are relevant.

every registrant poses is suggested [to the public] by the government's initiative in establishing the registration, verification, and community notification requirements in the first place," such that the public is unlikely to differentiate between sexual and non-sexual offenders on the registry. *State v Letalien*, 985 A2d 4, 23; 2009 ME 130 (2009). The resultant social stigma of being a sex offender might affect these offenders' ability to acquire and maintain housing and employment and to participate as a member of the community. See *People v Diaz*, 150 App Div 3d 60, 66; 50 NYS3d 388 (2017) (discussing "the harm caused to the individual who is forced to register, even though he or she has committed a crime that has no sexual component," as including that the label of "sex offender does far more than impose a stigma to one's reputation"—specifically, such a label "often results in the offender being subjected to social ostracism and abuse, and impedes the person's ability to access schooling, employment, housing, and many other areas"). See also *Neal v Shimoda*, 131 F3d 818, 829 (CA 9, 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a [person] as a sex offender."). Further, as a result of their non-sexual crimes, these offenders are subject to extensive law-enforcement supervision through the requirement that they immediately update law enforcement whenever potentially frequent life changes occur. They are also subject to other collateral consequences, including the affixation of conspicuous identifiers to passports, 22 USC 212b, and the potential for exclusion from public housing agencies, 24 CFR 982.553(a)(2) (2023). These demanding requirements and consequences—imposed on non-sexual offenders regardless of their risk of recidivism

27

as a group or individually—are excessive in comparison to SORA's asserted public-safety purpose.[19]

---

[19] The dissent falsely asserts that we conclude that public registration for non-sexual offenses does not reasonably advance the interests of public safety and "is not in any way a reasonable policy to advance [the Legislature's] purposes . . . ." It also disingenuously frames our perspective as imposing our own policy preferences over those of the Legislature. More accurately, as detailed above, we hold that the inclusion of non-sexual offenses in SORA *is* rationally related to SORA's public-safety purpose but that a consideration of the remaining *Mendoza-Martinez* factors demonstrates that SORA's punitive effects outweigh the Legislature's civil intent as to non-sexual offenders. For the same reason, the dissent's citation of several out-of-state cases considering due-process challenges that conclude that the inclusion of kidnapping in sex-offender registries is reasonably related to a legislative public-safety objective does not contradict our position here.

We do not dispute the seriousness of the non-sexual offenses involved nor the government's and the public's interest in preventing these crimes. But where the Legislature chooses to address these concerns and goals in a punitive manner, the courts must recognize those means as punishment and recognize the accordant constitutional rights guaranteed to those affected individuals. That conclusion is not based in policy preferences, and neither is it a conclusion that the sex-offender registry is a "sham." As to the latter, the dissent implies that this majority has today concluded that the sex-offender registry is a "sham." But we have not done so. The dissent's references to a "sham" are from Justice Kennedy's concurring opinion in *Hendricks*, where he commented in the context of an ex post facto analysis that if the relevant statute "were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish." *Hendricks*, 521 US at 371 (Kennedy, J., concurring). Our opinion does not ascribe such nefarious intent to the Legislature. Again, we believe that the Legislature included non-sexual offenses in the 2021 SORA to further a rational policy goal of public safety, but the punitive effects of imposing the 2021 SORA on non-sexual offenders ultimately outweigh this purpose when determining whether the statute constitutes punishment as applied to those offenders.

That conclusion is all that *Mendoza-Martinez* and its progeny require. We do not dispute that the United States Supreme Court in *Smith* indicated its approval of Justice Kennedy's observation in *Hendricks* that where statutory provisions "were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish," *id*. See *Smith*, 538 US at 103 ("A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance. The imprecision respondents rely upon does not suggest that the Act's nonpunitive purpose is a 'sham or

f. PUNITIVE EFFECTS CONCLUSION

At the end of the *Mendoza-Martinez* inquiry, this Court must answer whether defendant has demonstrated by "the clearest proof" that the 2021 SORA "is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Hendricks*,

mere pretext.' "), quoting *Hendricks*, 521 US at 371 (Kennedy, J., concurring). We also agree that where a legislature has done so, that action is indicative of punishment. We do dispute, however, that *Smith*'s singular and brief endorsement of *Hendricks* equates to a holding that punishment may *only* be found where a reviewing court determines that the legislative intent was a sham. We do not believe that the Legislature included non-sexual offenses in the 2021 SORA while knowing that such action would constitute punishment, see *Black's Law Dictionary* (12th ed) (defining "sham," in part, as "[a] false pretense or fraudulent show"), or that SORA's provisions regarding non-sexual offenders are wholly unrelated to its public-safety purpose. But we do hold that the Legislature's chosen means of implementing this public-safety purpose have "transformed what was clearly intended as a civil remedy into a criminal penalty." *Rex Trailer Co v United States*, 350 US 148, 154; 76 S Ct 219; 100 L Ed 149 (1956). (As the dissent identifies, this language from *Rex* occurred before the United States Supreme Court's decision in *Mendoza-Martinez*. But *Rex* has since been repeatedly and favorably quoted in ex post facto and double-jeopardy analyses regarding whether a statutory scheme is so punitive as to overcome the Legislature's civil intent. See, e.g., *Hudson v United States*, 522 US 93, 99; 118 S Ct 488; 139 L Ed 2d 450 (1997); *United States v Melvin*, 918 F3d 1296, 1299 (CA 11, 2017); *United States v Jumper*, 74 F4th 107, 112 (CA 3, 2023); *Dawson v Secretary of State*, 274 Mich App 723, 734; 739 NW2d 339 (2007) (opinion by WILDER, P.J.).)

To be clear, our disagreement with the dissent on this front rests in the interpretation of the language from *Hendricks*, not whether it has precedential value. The dissent's sensationalized concern regarding the rejection of precedent related to fundamental principles of law in other arenas obscures our actual disagreement. Again, we would read *Hendricks* as establishing one circumstance under which a court may find that a statutory scheme is punishment despite a legislature's civil intent, and the dissent would apparently read *Hendricks* as *always* requiring a "sham" to be found to conclude that a statutory scheme is punishment. We agree—as *Hendricks*, 521 US at 361, establishes—that only the " 'clearest proof' " can negate a legislature's intent to create a civil statutory scheme. (Citation omitted.) But we do not agree that such "clearest proof" can *only* occur with the finding of a "sham," which carries with it an implication of malevolent intent by a legislature. Having so defined this disagreement, we would not characterize our position or the dissent's position as "a lack of complete understanding of relevant jurisprudence or a willful indifference to it."

521 US at 361 (quotation marks, citation, and brackets omitted). We conclude that defendant has met this burden. Although the 2021 SORA bears a rational relation to its nonpunitive purpose and the Legislature has continued to express its intention that SORA constitute a civil regulation, SORA resembles traditional methods of punishment, promotes the traditional aims of punishment, and imposes affirmative restraints that are excessive as applied to non-sexual offender registrants. Accordingly, we conclude that the 2021 SORA constitutes punishment as applied to non-sexual offenders.[20]

---

[20] The dissent asserts that "it is difficult to see how" our holding today will remain limited to non-sexual offenders. Our opinion does not reach the question whether the 2021 SORA constitutes punishment as to sexual offenders—and, in fact, explicitly vacates the portion of the Court of Appeals opinion that so concluded. To the extent that portions of our *Mendoza-Martinez* analysis might be relevant to a later appeal that considers whether the 2021 SORA constitutes punishment as to sexual offenders, that relevance does not define the outcome of such a future challenge. The *Mendoza-Martinez* analysis is cumulative, and while some of our analysis here will be relevant to other circumstances, some will not. Perhaps the effects of the 2021 SORA as applied to sexual offenders are so punitive as to outweigh the Legislature's civil intent, and perhaps not. The dissent's concerns about the effects of today's holding are premature.

That being said, we do not dispute the significance of our holding today as to non-sexual offenders required to register under the 2021 SORA. Our Constitution provides additional protections to an individual when the government seeks to impose criminal punishment. See, e.g., Const 1963, art 1, § 15 (protecting against multiple punishments for the same offense); Const 1963, art 1, § 16 (protecting against cruel or unusual punishments); Const 1963, art 1, § 10 (protecting against the retroactive increase of criminal punishment). Those fundamental protections are important even when—or especially when—they apply to an unsympathetic defendant. And if this Court later determines that the 2021 SORA constitutes punishment as to sexual offenders, those offenders will receive the same protections, regardless of how distasteful some might find the result.

## B. WHETHER THE PUNISHMENT IS CRUEL OR UNUSUAL

Having concluded that imposition of the 2021 SORA constitutes criminal punishment as applied to non-sexual offenders, we must next answer whether that punishment is cruel or unusual. The focus of this inquiry is whether a punishment is "grossly disproportionate." *Bullock*, 440 Mich at 34 n 17. To evaluate whether a punishment is "grossly disproportionate," a reviewing court must consider four factors: (1) the harshness of the penalty compared to the gravity of the offense; (2) the penalty imposed for the offense compared to the penalties imposed for other offenses in Michigan; (3) the penalty imposed for the offense in Michigan as compared to the penalty imposed for the same offense in other states; and (4) whether the penalty imposed advances the goal of rehabilitation. *Id*. at 33-34.

### 1. HARSHNESS OF THE PENALTY COMPARED TO THE GRAVITY OF THE OFFENSE

The first *Bullock* factor asks this Court to consider the harshness of the penalty compared to the gravity of defendant's offense of false imprisonment of a minor. At the outset, we note that the facts of this case are disturbing. Defendant held his family hostage and in imminent fear for their lives for more than 12 hours, resulting in convictions not only of unlawful imprisonment but also torture, felonious assault, and felony-firearm. However, here, we are concerned only with defendant's conviction of unlawful imprisonment of a minor and the additional penalty of being required to register as a sex offender.

Although defendant's offense was undoubtedly severe, that offense contained no sexual element and no indication that defendant poses a risk of committing sexual crimes

31

in the future. Nonetheless, for 15 years beyond the imprisonment served for his crimes, defendant is subject to the onerous requirements of a registry designed to "prevent[] and protect[] against the commission of future criminal sexual acts . . . ." MCL 28.721a. SORA, by identifying defendant as a sex offender, has subjected defendant to the same societal stigma and punishment as if defendant had committed a sexual offense. This is inconsistent with the principle that, "[t]o be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt." *Harmelin v Michigan*, 501 US 957, 1023; 111 S Ct 2680; 115 L Ed 2d 836 (1991) (White, J., dissenting), citing *Enmund v Florida*, 458 US 782, 800-801; 102 S Ct 3368; 73 L Ed 2d 1140 (1982). Defendant is not personally or morally responsible for having committed a sex offense, and yet SORA treats him as if he is. This penalty of being subject to the sex-offender registry for a non-sexual crime, imposed in addition to a defendant's prison sentence for the non-sexual crime committed, is excessive in comparison to the offense committed and so weighs in favor of a conclusion of gross disproportionality. See *Bullock*, 440 Mich at 40.

2. PENALTY IMPOSED FOR THE OFFENSE COMPARED TO OTHER OFFENSES

As compared to other offenses in Michigan, false imprisonment of a minor is one of only three offenses for which a conviction does not necessarily require commission of a sexual act that results in placement on the sex-offender registry. See MCL 28.722(r)(*iii*) (unlawful imprisonment of a minor), (t)(*i*) (accosting, enticing, or soliciting a minor), and (v)(*ii*) (kidnapping a minor). As a Tier I offender under SORA, persons convicted of false imprisonment of a minor suffer the same penalty as those that caused a child to engage in

32

child sexually abusive activities for the purpose of producing any child sexually abusive materials, MCL 28.722(r)(*i*) and MCL 750.145c(2); those that produced child sexually abusive activities or materials, MCL 28.722(r)(*i*) and MCL 750.145c(2); those that indecently exposed themselves to a child, MCL 28.722(r)(*ii*) and MCL 750.335a; those that engaged in prostitution, MCL 28.722(r)(*iv*) and MCL 750.449a; those that committed fourth-degree criminal sexual conduct, MCL 28.722(r)(*v*) and MCL 750.520e; those that committed assault with intent to commit criminal sexual conduct, MCL 28.722(r)(*v*) and MCL 750.520g; and those that surveilled or photographed a child's genitalia, buttocks, or breasts either naked or clad in undergarments, MCL 28.722(r)(*vi*) and MCL 750.539j. These offenses all involve a sexual component and often sexual exploitation of a child, unlike defendant's offense.[21]

The imposition of SORA registration on a non-sexual offender like defendant is rare and subjects him to the same penalty as the sexual offenders described earlier. In contrast, defendant's conviction of false imprisonment of an adult did not subject defendant to SORA registration, and his punishment for that crime was accordingly less severe. That is, defendant's conviction of false imprisonment of an adult, for his actions related to Jacqueline, did not subject defendant to placement on the sex-offender registry even though the same actions taken against his children did subject him to SORA registration. To the extent that false imprisonment of a minor is a more-severe offense

---

[21] As the dissent identifies, other crimes punishable by shorter terms of imprisonment are subject to the same or greater periods of registration on the sex-offender registry. But each of those offenses includes a sexual component and so the punishment is more appropriately tailored to the offense at issue.

33

than false imprisonment of an adult, the imposition of SORA registration—and, particularly, the identification of defendant as a sex offender—goes far beyond a proportionate increase in punishment.

We conclude that the comparison of defendant's non-sexual offenses to more-severe sexual offenses that result in a similar penalty and to similar non-sexual offenses resulting in less-severe penalties supports a conclusion that the punishment imposed by the application of SORA to a non-sexual offender is grossly disproportionate.

### 3. PENALTY IMPOSED FOR THE OFFENSE COMPARED TO OTHER STATES

Next, we consider the penalty imposed on defendant for false imprisonment of a minor in Michigan as compared to the penalty for similar offenders in other states. Michigan is in the majority of jurisdictions insofar as it includes certain non-sexual offenses within its sex-offender-registry law. See *Smith*, 323 Wis 2d at 383 n 4 (concluding that 42 states, as well as the District of Columbia, include kidnapping or false imprisonment

of a minor as registrable offenses).[22, 23]  It is somewhat difficult, however, to assess the

persuasive value of the inclusion of these crimes in other states' sex-offender-registry laws

[22] By our present count, 44 states currently include non-sexual offenses as listed offenses. Ala Code 15-20A-5(15), (16), and (17) (unlawful imprisonment and kidnapping); Alaska Stat 12.63.100(2) (kidnapping); Ariz Rev Stat Ann 13-3821(A)(1) and (2) (unlawful imprisonment and kidnapping); Ark Code Ann 12-12-903(13)(A)(*i*)(n), (p), (q), (r), and (v) (stalking, exposing another person to human immunodeficiency virus, kidnapping, false imprisonment, permanent detention or restraint); Conn Gen Stat 54-250(2) (unlawful restraint and kidnapping); Del Code Ann, tit 11, § 4121(a)(4)(a) and (d) (dealing in children and kidnapping); Fla Stat 943.0435(1)(h)(1)(a)(I) (kidnapping, false imprisonment, and luring or enticing a child); Ga Code Ann 42-1-12(a)(9)(A)(*i*) and (*ii*) (kidnapping and false imprisonment); Haw Rev Stat 846E-1 (kidnapping and false imprisonment); Idaho Code 18-8304(1)(a) (kidnapping and ritualized abuse of a child); 730 Ill Comp Stat 150/2(B)(1) (ritualized abuse of a child); Ind Code 11-8-8-4.5(a)(11), (12), and (19) (kidnapping, criminal confinement, and human trafficking); Iowa Code 692A.102(1)(b)(5) (false imprisonment); Kan Stat Ann 22-4902(e)(1)(G) and (H) (kidnapping and criminal restraint); Ky Rev Stat Ann 17.500(3)(a)(1) and (2) (kidnapping and unlawful imprisonment); La Stat Ann 15:541(12)(a), (12)(b)(*i*), (12)(b)(*ii*), (12)(d), and (24)(a) (false imprisonment, kidnapping, human trafficking, stalking, and intentional exposure to human immunodeficiency virus); Md Code Ann, Crim Proc 11-701(p)(3), (q)(1)(*iii*), and (q)(3) (sale of a minor, kidnapping, and false imprisonment); Mass Gen Laws, ch 6, § 178C (kidnapping); MCL 28.722(r)(*iii*), (t)(*i*), and (v)(*ii*) (unlawful imprisonment of a minor, enticement for immoral purposes, and kidnapping); Minn Stat 243.166(1b)(a)(1)(*ii*), (2)(*i*), and 2(*ii*) (kidnapping, false imprisonment, and abuse through deprivation or confinement); Miss Code Ann 45-33-23(h)(*i*) and (*v*) (kidnapping and enticing a child for concealment); Mo Rev Stat 589.400(1)(2) (kidnapping and false imprisonment); Mont Code Ann 46-23-502(10)(a)(*i*), (*ii*), (*x*), and (*xii*) (unlawful restraint, kidnapping, endangering the welfare of children, and ritual abuse of a minor); Neb Rev Stat 29-4003(1)(a)(*i*)(A), (B), and (L) (kidnapping, false imprisonment, and criminal child enticement); Nev Rev Stat 179D.0357(1), (2), and (3) (kidnapping, false imprisonment, and involuntary servitude of a child); NH Rev Stat Ann 651-B:1(VII)(a) (kidnapping, criminal restraint, and false imprisonment); NJ Stat Ann 2c:7-2(b)(1) and (2) (kidnapping, criminal restraint, false imprisonment, and luring or enticing a child with the purpose to commit a crime with or against the child); NY Correct Law 168-a(2)(a)(*i*) (kidnapping, unlawful imprisonment, and luring a child with the intent to commit a crime against the child); NC Gen Stat 14-208.6(1m) (kidnapping, abduction of children, and felonious restraint); ND Cent Code 12.1-32-15(1)(a) (kidnapping, felonious restraint, removing a child from the state in violation of a custody decree, trafficking of an individual, and forced labor); Ohio Rev Code Ann 2950.01(C)(1) and (2) (kidnapping, abduction, unlawful restraint, and criminal child enticement); Okla Stat, tit 57, § 582(A) (trafficking in children); Or Rev Stat

because the requirements imposed by each state's sex-offender-registry law vary greatly. In other words, the inclusion of a non-sexual offense on another state's sex-offender registry could represent a greater, equal, or less-severe penalty than the same offense in Michigan depending on the requirements of that state's sex-offender-registry law, a complication left unaddressed by the dissent. While the relative severity of the imposed penalty requires a state-by-state comparison of each sex-offender-registry law and is accordingly unfit for categorical comparison, we can conclude that Michigan is in a large majority of states whose sex-offender registries categorize persons who committed non-

163A.005(5)(p) and (z) (kidnapping and burglary with the intent to kidnap); 42 Pa Cons Stat 9799.14(b)(1) to (4) and (d)(1) (unlawful restraint, false imprisonment, interference with custody of children, luring a child into a motor vehicle or structure, and kidnapping); RI Gen Laws 11-37.1-2(f)(1) and (12) (kidnapping, false imprisonment, trafficking an individual, and forced labor); SC Code Ann 23-3-430(C)(3)(d) (kidnapping); SD Codified Laws 22-24B-1(8) and (21) (kidnapping and human trafficking); Tenn Code Ann 40-39-202(20)(A)(*v*) and (*vi*) (false imprisonment and kidnapping); Tex Code Crim Proc Ann 62.001(5)(E) (kidnapping and unlawful restraint); Utah Code Ann 77-41-102(10)(a)(*i*), (*iv*), and (*v*) (kidnapping, human trafficking, and human smuggling); Va Code Ann 9.1-902(A) (abduction and kidnapping); Wash Rev Code 9A.44.130(1)(a) (kidnapping, unlawful imprisonment, luring, trafficking, custodial interference, and coercion of involuntary servitude); Wis Stat 301.45(1d)(b) (kidnapping, false imprisonment, abduction, and exposing a child to harmful material); Wyo Stat Ann 7-19-301(a)(*iv*)(A) to (C) and (J) (kidnapping, felonious restraint, false imprisonment, and human trafficking). Compare with the following states, for which all registrable offenses are sexual offenses: Cal Penal Code 290(c)(1) (kidnapping, but only with intent to commit a separate sex offense); Colo Rev Stat 16-11.7-102(3); Me Stat, tit 34-A, § 11273; NM Stat Ann 29-11A-3(I); Vt Stat Ann, tit 13, § 5401(10); W Va Code 15-12-2(b).

[23] Notably, although false imprisonment of a minor is a non-sexual offense frequently included in sex-offender registries (as detailed earlier), many jurisdictions other than Michigan except the false imprisonment of a minor by a parent—as occurred here. See, e.g., Mo Rev Stat 589-400(8); Ga Code Ann 42-1-19(a)(3) and (c)(1); NY Correct Law 168-a(2); Ark Code Ann 12-12-903(13)(A)(*i*)(q) and (r); Wis Stat 301.45(1d)(b); Ky Rev Stat Ann 17.500(3)(a)(1) and (2).

sexual offenses as sex offenders, and so this factor supports a determination that defendant's punishment is not grossly disproportionate.

## 4. WHETHER THE PENALTY IMPOSED ADVANCES THE GOALS OF REHABILITATION

Finally, the application of SORA to non-sexual offenders like defendant does not support the goal of rehabilitation. See *Bullock*, 440 Mich at 34. Branding an offender who did not commit a sexual offense as a sex offender and subjecting that offender to the attendant social stigma and law-enforcement supervision of that label does not address the underlying causes of a defendant's conduct or support a defendant's reintegration as a noncriminal member of society. In fact, the imposition of SORA on defendant could actually "work[] at an opposite purpose [to rehabilitation], [by] preventing defendant from securing employment and otherwise moving forward with his life plans." *People v Dipiazza*, 286 Mich App 137, 156; 778 NW2d 264 (2009). Accordingly, we conclude that this factor supports a determination that defendant's punishment is grossly disproportionate to his crimes.

## 5. GROSSLY DISPROPORTIONATE CONCLUSION

We conclude that the punishment of SORA registration for non-sexual offenders like defendant is grossly disproportionate and accordingly constitutes cruel or unusual punishment under the Michigan Constitution. See *Bullock*, 440 Mich at 35. Although other jurisdictions similarly include certain non-sexual offenders within their sex-offender-registry laws, we find that this penalty is unduly harsh as compared to the non-sexual nature of the offense. Further, similar offenses do not result in this same penalty, and the offenses that do result in the same penalty are more severe and have a sexual component.

37

Accordingly, we conclude that the 2021 SORA constitutes cruel or unusual punishment as applied to non-sexual offenders.[24]

## IV. CONCLUSION

For the reasons discussed in this opinion, we conclude that the imposition of the 2021 SORA on non-sexual offenders like defendant constitutes cruel or unusual punishment under the Michigan Constitution. Accordingly, we vacate the opinion of the Court of Appeals insofar as its conclusions went beyond the consideration of non-sexual offenders and affirm its judgment that defendant and other offenders whose crimes lacked a sexual component are entitled to removal from the sex-offender registry.

Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

---

[24] This narrow holding is workable. As represented by amicus the Michigan State Police, after the Court of Appeals rendered its decision in this case, 295 registrants like defendant who were convicted of non-sexual offenses and whose offenses had no sexual component were removed from the sex-offender registry. Fourteen registrants who were convicted of non-sexual offenses but whose offenses had a sexual component remain on the registry.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee/Cross-
        Appellant,

v                                     No. 164685

CORA LADANE LYMON, also known as
COREY LYMON,

        Defendant-Appellant/Cross-
        Appellee.

_____

ZAHRA, J. (*dissenting*).

In *People v Betts*,[1] this Court held that retroactive application of Michigan's Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*., as amended by 2011 PA 17 and 18 (the 2011 SORA), was unconstitutional because it was an ex post facto punishment. Federal courts had previously enjoined the version of SORA at issue in *Betts*, and while *Betts* was pending, the Legislature substantially revised SORA in 2021 to be nearly identical to the federal registry under the Sex Offender Registration and Notification Act (SORNA). In this case, the majority opinion concludes that requiring defendants who kidnap or imprison children to register is punishment that is cruel or unusual, in violation of the Michigan Constitution. The majority opinion heavily relies on this Court's decision in *Betts*. But while *Betts* may have concluded correctly that much of the 2011 SORA was an unconstitutional ex post facto law, the reasoning

_____

[1] *People v Betts*, 507 Mich 527, 533; 968 NW2d 497 (2021).

in *Betts* was suspect and for the most part unnecessary. Similar to *Betts*, the majority opinion in this case misapplies precedent from the Supreme Court of the United States from which we derive our jurisprudence on the distinction between civil measures and criminal punishment. And by contrast to *Betts*, the Court in this case invalidates the operation of a *currently effective* registry.

In today's decision, this Court comes to the conclusion that placing child kidnappers on a registry is not a reasonable measure to advance the goal of public protection. The majority opinion ignores that countless Michigan families rely on the registry to ensure their safety. Michigan's elected representatives and Governor signed SORA into law with provisions that included offenders who kidnapped or imprisoned children, as did 42 other states and the federal government itself with the enactment of analogous registries.[2] For all intents and purposes, this

---

[2] These include: the United States Government, 34 USC 20911(7); Alabama, Ala Code 15-20A-5; Alaska, Alaska Stat 12.63.100 (included in "sex offender" chapter and ties other sex offenses and kidnapping in the title of the registry); Arizona, Ariz Rev Stat 13-3821; Arkansas, Ark Code Ann § 12-12-903; Connecticut, Conn Gen Stat 54-250; Delaware, Del Code Ann, tit 11, § 4121 (including kidnapping and child sales without sexual acts in the language of the legal elements); Florida, Fla Stat 943.0435 (also called "sexual predators"); Georgia, Ga Code Ann 42-1-12; Hawaii, Haw Rev Stat 846E-1; Idaho, Idaho Code 18-8304; Indiana, Ind Code 11-8-8-4.5; Iowa, Iowa Code 692A.102 (false imprisonment but not kidnapping); Kansas, Kan Stat Ann 22-4902; Kentucky, Ky Rev Stat Ann 17.500; Louisiana, La Stat Ann 15:541 (also titling offenders as "child predators"); Maine, Me Stat, tit 34-A, § 11273 (removed for offenses committed after 2022); Maryland, Md Code Ann, Crim Proc 11-701; Massachusetts, Mass Gen Laws, ch 6, § 178C; Michigan, MCL 28.722; Minnesota, Minn Stat 243.166 (also titled offenders as "predators"); Mississippi, Miss Code Ann 45-33-23; Missouri, Mo Rev Stat 589.400 and 589.414; Montana, Mont Code Ann 46-23-502 (called "sex offenses," included in registry for sexual and violent offenses); Nebraska, Neb Rev St 29-4003; Nevada, Nev Rev Stat 179D.0357 (including child servitude); New Hampshire, NH Rev Stat Ann 651-B:1; New Jersey, NJ Stat Ann 2c:7-2; New York, NY Correct Law 168-a; North Carolina, NC Gen Stat 14-208.6; Ohio, Ohio Rev Code Ann 2950.01; Oregon, Or Rev Stat 163A.005; Pennsylvania, 42 Pa Cons Stat 9799.12 (called "sexually violent offense"); Rhode Island, RI Gen Laws 11-37.1-2; South Carolina, SC Code Ann 23-3-430; South Dakota, SD Codified Laws 22-24B-1; Tennessee, Tenn

Court holds that the policy choice of the residents of this state and an overwhelming number of other American jurisdictions lacks a substantial basis in public protection. According to the majority opinion, offender registration for those who kidnap and wrongfully imprison children can only be justified as a form of punishment for the offender. Yet, as has been understood for decades while the policy has been in place, kidnapping and child imprisonment are *closely* associated with sexual abuse. According to findings by the United States Congress, a *majority* of non-family child abductions involve some form of sexual abuse or other mistreatment.[3] Sexual abuse, particularly against young children, and child abuse are very difficult to prove in

Code Ann 40-39-202; Texas, Tex Code Crim Proc Ann 62.001; Utah, Utah Code Ann 77-41-102 (combined, called "offenders," and includes offenses recognized as sex offenses from other states); Virginia, Va Code Ann 9.1-902; Washington, Wash Rev Code 9A.44.130; Wisconsin, Wis Stat 301.45; Wyoming, Wyo Stat Ann 7-19-301; see also North Dakota, ND Cent Code, 12.1-32-15 (requiring the same form of registration but publishes it in a separate public registry). Seven states have enacted the policy choices preferred in the majority opinion: California, Colorado, Illinois, New Mexico, Oklahoma, Vermont (but applying it to offenders who are considered "sex offenders" in the location of conviction, Vt Stat Ann, tit 13, § 5401), and West Virginia (changed only in 2018, W Va Code 15-12-2).

[3] See Jacob Wetterling Crimes Against Children Registration Act, Committee on the Judiciary, HR Rep No. 103-392 (1993) ("Each year, the Department of Justice estimates there are approximately 114,000 non-family attempted child abductions. . . . Two-thirds of the cases of non-family child abduction reported to police involve sexual assault. . . . The Committee believes that protection of children from violence and sex offenses falls clearly within the Federal government's purview in protecting the health, safety and welfare of its citizens."); see also U.S. Department of Justice, *Child Victims of Stereotypical Kidnappings Known to Law Enforcement in 2011* (2016), p 4 (finding that specified kidnappings and abductions involved sexual abuse more than 60% of the time and physical abuse more than 70% of the time, in line with findings from 1997 from the Department of Justice), available at <https://www.unh.edu/ccrc/sites/default/files/media/2022-02/child-victims-of-stereotypical-kidnappings-known-to-law-enforcement-in-2011.pdf> (accessed June 13, 2024) [https://perma.cc/6TCY-RLZR].

a criminal trial.  Convictions compared to the incidence of the offense are few and far between.[4]

Policymakers in this state and around the country have the right to enact public registration for

---

[4] Despite the trauma and serious long-term impact of sexual abuse, it is extraordinarily underreported.  See, e.g., U.S. Department of Justice, *Criminal Victimization, 2022*, NCJ 307089 (September 2023), p 6 (explaining that between 2021 and 2022, around 22% of rapes and sexual assaults were reported to police, the lowest of any category of violent crime and lower than the average for violent crime at 42% to 45%), available at <https://bjs.ojp.gov/document/cv22.pdf> (accessed June 14, 2023) [https://perma.cc/7U2N-ARUK]; U.S. Department of Justice, *Criminal Victimization, 2018*, NCJ 253043 (September 2019), p 8 (finding the same results for 2017 and 2018, with a reporting rate of 25% to 40% for rapes and sexual assaults, which was below all other categories of violent crime, and the average for violent crime was 43% to 45%), available at <https://bjs.ojp.gov/content/pub/pdf/cv18.pdf> (accessed June 14, 2023) [https://perma.cc/Z4BF-YCHD].  Given the highly personal nature of sexual assault, the fact that most perpetrators are known to or family of the victim, and the low rates of prosecutorial success, many victims choose not to come forward, relive their trauma, and testify in a public trial against their assailant.  See The Centers for Disease Control and Prevention, *Prevalence and Characteristics of Sexual Violence, Stalking, and Intimate Partner Violence Victimization— National Intimate Partner and Sexual Violence Survey, United States, 2011* (September 5, 2014), p 7 (finding that the vast majority of sexual assailants are sexual partners, family, or friends; only 11% to 15% of rapists are strangers), available at <https://www.cdc.gov/mmwr/pdf/ss/ss6308.pdf> (accessed June 14, 2024) [https://perma.cc/A5CR-9PVA].  Even when sexual abuse is reported to the police, the percentage of cases brought forward that lead to arrests and charges is very low.  See, e.g., U.S. Department of Justice, *Uniform Crime Report: Crime in the United States, 2018—Offenses Cleared* (2019), p 2 (stating that reported sexual crimes, including rape and sexual assault, have some of the lowest rates of clearance to charge, sitting at 33% and below the 46% average for violent crimes), available at <https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances.pdf> (accessed June 14, 2024) [https://perma.cc/297C-XF3J].  And when reporting is made and charges are actually brought, the conviction rates are very low.  See U.S. Department of Justice, *Felony Defendants in Large Urban Counties, 2009—Statistical Tables*, NCJ 243777 (December 2013), p 22 ("The probability that a defendant would eventually be convicted of the original felony charge" was the "lowest . . . for those charged with rape (35%) and assault (33%)."), available at <https://bjs.ojp.gov/content/pub/pdf/fdluc09.pdf> (accessed June 14, 2024) [https://perma.cc/9RBM-VWYW].  Very similar statistics exist for child abuse and child sexual abuse.  Gilbert et al, *Burden and Consequences of Child Maltreatment in High-Income Countries*, 373 Lancet 68, 68 (January 2009) (indicating that "less than a tenth" of child abuse is reported); U.S. Department of Justice, *Youth Victimization: Prevalence and Implications*, NCJ 194972 (April 2003), p ii (finding that 65% of physical abuse and 86% of sexual abuse of children is not reported), available at

those who have been convicted of child kidnapping or imprisonment, if for no other reason than the real possibility that those individuals participated in serious child abuse when committing their crimes[5] or have the concerning predisposition, willingness, and ability to do so. Notably, the federal government itself places child kidnapping in the *most serious category* of offenses on the national registry.[6]

The majority opinion fails to afford proper weight to the fact that providing information obtained from *public* trials on types of convictions that are strongly tied to sexual abuse of children empowers citizens with knowledge of the truth and advances public protection, not punishment. Registration provides vital information for the parent who must choose a babysitter or entrust a child with a volunteer coach. The fact that a stranger was "only" convicted of child kidnapping is no comfort for those responsible for the well-being of children. Simply put, it is

---

<https://www.ojp.gov/pdffiles1/nij/194972.pdf>     (accessed     June     14,     2024) [https://perma.cc/V25N-BR4W].

Given the high likelihood that offenders will not be held accountable and the lifelong damage resulting from sexual and child abuse, it is apparent that the government has extraordinary interests in administering systems to ensure that the public has the information and ability to take precautions so as to prevent those offenses from occurring.

[5] There are innumerable reasons why a defendant would be convicted of kidnapping or imprisoning a child but not criminal sexual conduct, for many of the same reasons why sexual abuse and child abuse themselves are significantly underenforced. For instance, the victim might not be willing and able to testify or testify fully as to their abuse; due to credibility disputes, a prosecutor might not be able to prove an offense or all the offenses beyond a reasonable doubt (as opposed to a likelihood); or a prosecutor might agree to a plea deal to reduce charges and avoid extended litigation.

[6] 34 USC 20911(4)(B).

a misnomer to classify Michigan's registry, which was modeled almost entirely from the federal registry and tied to federal funding, as disguised punishment.[7]

Finally, even if the statutorily mandated registry is deemed punishment, allowing citizens to be informed of child kidnapping and imprisonment convictions that resulted from public trials simply is not cruel or unusual punishment. For this Court to conclude otherwise is confounding. Placement of accurate and public information on a public registry for citizens to make their own decisions on an informed basis is not remotely akin to other forms of cruel or unusual punishment, such as torture, execution of the mentally ill, or life imprisonment for juveniles.

The registry provides basic information that empowers individuals to make informed decisions and direct their own lives. By establishing holes and missing information—registering some offenders but not others—today's decision facially undermines the reliability and, therefore, the value of a registry. And in the larger perspective, the Court continues to chip away at the legal foundations of public registries. Given the logic inherent in this decision and in the Court's prior decision in *Betts*, Michigan's sex offender registry, in whole or in part, now rests on borrowed time. While the majority opinion limits its holding to offenses such as child kidnapping and imprisonment that do not per se include an element of sexual abuse, there is no principled reason to limit the Court's holding to these offenses. For these reasons, I dissent.[8]

---

[7] The decision today effectively dismantles a properly functioning sex offender registry for those convicted of kidnapping or child imprisonment and also risks federal funding tied to the maintenance of the registry. See 34 USC 20927(b)(3) and (4) (even in the case of state high court rulings, requiring the state to implement "reasonable alternative procedures" to implement the basic goals of the registry, including registration of child kidnappers, 34 USC 20901, or lose 10% of federal funding for the state's criminal justice system).

[8] The majority opinion describes in some detail the events leading to defendant's conviction. Additional horrific details are provided, to the extent pertinent to the question whether the

## I.  THE QUESTIONABLE ASPECTS OF THIS COURT'S *BETTS* DECISION IN COMPARISON TO THE DECISION OF THE SUPREME COURT OF THE UNITED STATES IN *SMITH v DOE*

Much of today's decision and rationale, whereby a majority of the Court now holds that making convictions for kidnapping and imprisoning children known to the public through the state's sex offender registry is cruel or unusual punishment, is taken directly from this Court's decision in *Betts*.  While the ultimate conclusion in *Betts* might have been correct, the reasoning was deeply flawed and unnecessary to resolve the dispute then before this Court.  Further, this Court's reasoning in *Betts* conflicted headlong with United States Supreme Court precedent, from which we derive our jurisprudence on the distinction between civil measures and criminal punishment.  The majority opinion in this case is flawed for the same reasons *Betts* was flawed.

### A.  *SMITH v DOE* AND THE LAW ON WHAT CONSTITUTES PUNISHMENT

Michigan courts have relied upon well-developed federal law when analyzing whether a government action is civil in nature or a criminal punishment.[9]  There is no indication or textual basis in the Michigan Constitution to provide a different analysis than that applicable to the

___

registry is cruel or unusual punishment as applied to defendant.  Aside from this, it is noteworthy that to this day, defendant downplays his actions as an isolated loss of control in a high-stress situation despite having already been convicted by a jury of his crimes after making the same plea.  The reality is, at the very least, he tortured two children by threatening to kill them and their mother, forced them to kneel at a fireplace, and held them in his control while he made up his mind on whether they would be shot; this conduct persisted for *hours* while the children pleaded, begged, yelled, and prayed to God.  Defendant inflicted horrific and extreme abuse on the children, from which the children will undoubtedly forever suffer harm.  This was not an ordinary or passing lapse of judgment or loss of control.  This was a heinous act of child abuse.  Defendant's own summary of the facts on appeal as a "very bad day" betrays a profound lack of appreciation of his actions and the jury's verdict.  It only highlights the vital importance of protecting the public from defendant, his actions, and his ability to inflict extraordinary harm on children in the future.

[9] *People v Earl*, 495 Mich 33, 43-44; 845 NW2d 721 (2014); see also *Betts*, 507 Mich at 543.

United States Constitution for whether an action is a "punishment."[10]  And in determining whether a government action is a punishment, the Court applies the intent-and-effects test provided under the *Mendoza-Martinez* federal standard.[11]  The Supreme Court of the United States in *Smith v Doe* definitively resolved a festering question as to whether modern sex offender registries, originating primarily in the 1990s, are criminal punishment.[12]  The Supreme Court reviewed a challenge to Alaska's registry, which used the standard model of registries employed around the country called "Megan's law."[13]  Applying the *Mendoza-Martinez* factors, the Supreme Court of the United States concluded that sex offender registries, which combined

---

[10] Const 1963, art 1, § 16 ("[C]ruel or unusual punishment shall not be inflicted[.]"); US Const, Am VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").  By contrast, Michigan relies primarily upon an old federal standard, which has now been discarded by the federal courts, to consider whether a punishment is "[c]ruel or unusual."

[11] *Kennedy v Mendoza-Martinez*, 372 US 144, 168-169; 83 S Ct 554; 9 L Ed 2d 644 (1963). Unlike the majority opinion, I do not consider the *Mendoza-Martinez* factors individually and isolated from the major holdings of the Supreme Court of the United States in *Smith*, applicable caselaw addressing the *Mendoza-Martinez* factors, and this Court's decision in *Betts*.  See note 21 of this opinion (describing the *Mendoza-Martinez* factors).  In so doing I provide a substantive description of the relevant facts, issues, and analysis that governs each of the relevant *Mendoza-Martinez* factors as applied to SORA, namely the lack of historical analogues, the lack of affirmative restraints, the lack of advancement of traditional goals of punishment, and the reasonable advancement of a rational nonpunitive objective (akin to rational-basis review).  As noted below, the factors of scienter and application to behavior already criminalized are not applicable in a review of the registry.

[12] *Smith v Doe*, 538 US 84; 123 S Ct 1140; 155 L Ed 2d 164 (2003).

[13] *Id*. at 89-90 (explaining the nationwide context of sex offender registries, "Megan's Law," and the federal funding conditioned on maintaining a registry).

8

kidnapping offenses in the same registry,[14] were not punishment but instead civil measures designed to provide public protection.

The Supreme Court first examined the intent of the Alaska legislature. Concern about the risks of offenders released into the public who committed serious crimes was the express purpose of enacting the statute. The Alaska legislature stated that the registry would serve the interests of public awareness and protection, which the Supreme Court deemed to be a civil objective.[15] Simply because a goal of the legislature, specifically protection of the public from criminal acts, is also "consistent with the purposes of the . . . [c]riminal justice system" did not mean that a government's choice was punitive.[16]

The Supreme Court next inquired into whether the effect of the statute was "so punitive either in purpose or effect as to negate the State's intention to deem it civil."[17] This is similar to the inquiry that courts must make under the Equal Protection Clause as to whether a law that is facially neutral on suspect categories is, in fact, an "obvious pretext for . . . discrimination."[18] In

---

[14] Given that Michigan's unlawful-imprisonment statute requires more than just restraint, but also use of a dangerous weapon, secrecy, or the commission of another felony, it is highly analogous to the Alaska crime of kidnapping as it existed at the time of the decision. Compare MCL 750.349b with Alaska Stat 11.41.300, as amended by 1998 HB 375.

[15] *Id*. at 93, citing *Kansas v Hendricks*, 521 US 346, 363; 117 S Ct 2072; 138 L Ed 2d 501 (1997).

[16] *Smith*, 538 US at 94.

[17] *Id*. at 92 (quotation marks, citation, and brackets omitted).

[18] *Personnel Administrator of Mass v Feeney*, 442 US 256, 272; 99 S Ct 2282; 60 L Ed 2d 870 (1979). It is also highly analogous to rational-basis review in other contexts. See, e.g., *United States v Kebodeaux*, 570 US 387, 395-396; 133 S Ct 2496; 186 L Ed 2d 540 (2013) (citing *Smith* and rational-basis caselaw to hold that SORNA was "eminently reasonable" despite "conflicting evidence" and therefore could be applied to military convictions); *Doe v Settle*, 24 F4th 932, 949 (CA 4, 2022) ("This inquiry is reminiscent of the rational basis test . . . ."); *Nelson v Town of*

essence, the inquiry looks past the stated intent of the legislature and requires a determination that the effects of the law are so significant as to imply an unstated punitive intent, recognizing the stated intent as a "sham," "pretext," or "disguise."[19] Such a conclusion is extraordinary, cutting against established deference to the intents and designs of elected legislatures. It therefore requires "the clearest proof" that the statute can only be considered punitive, "transform[ing] what has been denominated a civil remedy into a criminal penalty."[20] To resolve this question, the Court referred to the nonexhaustive *Mendoza-Martinez* factors.[21]

---

*Paris*, 78 F4th 389, 400 (CA 7, 2023) (analyzing the standard with crossovers from rational-basis review); compare *Armour v Indianapolis*, 566 US 673, 685; 132 S Ct 2073; 182 L Ed 2d 998 (2012) (explaining that rational basis does not require a "perfect" or even a "superior" choice, but instead one that is "rational").

[19] *Smith*, 538 US at 103; *Hendricks*, 521 US at 365-366 (explaining that the effects were not so significant so as to indicate that the statute was "disguised punishment"); *Allen v Illinois*, 478 US 364, 373; 106 S Ct 2988; 92 L Ed 2d 296 (1986) (reasoning that the effects of a commitment statute were not "incompatible with the State's asserted interest," such as by showing that there was actually no difference between those convicted of a crime and those subject to commitment); *Flemming v Nestor*, 363 US 603, 617, 619; 80 S Ct 1367; 4 L Ed 2d 1435 (1960) (warning against holding that a statute is punitive despite its stated intent by emphasizing that "[j]udicial inquiries into Congressional motives are at best a hazardous matter" and rejecting that the effects of a statute were "evidence of punitive intent").

[20] *Smith*, 538 US at 92 (quotation marks and citation omitted); *Hendricks*, 521 US at 361 (noting the "heavy burden" placed on litigants attempting to override the legislature's determination); see also note 19 of this opinion.

[21] *Mendoza-Martinez*, 372 US at 168-169; see also *Hudson v United States*, 522 US 93, 99-100; 118 S Ct 488; 139 L Ed 2d 450 (1997) ("(1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned") (quotation marks, citation, and brackets omitted).

In applying this standard, the Supreme Court first noted that registries were of recent origin, signaling that they were *not* historically regarded as punishment.  Further, the Court expressly rejected the argument that registries were analogous to historical forms of "shaming," like standing in the public square or being branded "M" for murderer.[22]  The public harm from punishments such as "shaming, humiliation, and banishment" involved "more than the dissemination of information."[23]  By contrast, any stigma from modern registries results "not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public."[24]  Public access to information regarding criminal proceedings is fundamental to the American system.  The Supreme Court of the United States spoke clearly: "[O]ur criminal law tradition insists on public indictment, public trial, and public imposition of sentence.  Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused."[25]  Public and face-to-face confrontation often with corporal elements of the 1700s simply is not an "integral part of the objective" of registries.[26]  The fact that publication of a registry is widespread—given that it is distributed on the Internet—and may cause social ostracism or

---

[22] *Smith*, 538 US at 97-98.

[23] *Id*. at 98.

[24] *Id*.

[25] *Id*. at 99.

[26] *Id*.

shame from the accurate information it provides does not alter the fact that the scheme is designed and operates to "inform the public for its own safety . . . ."[27]

As to whether registries impose an affirmative disability or restraint, the Supreme Court noted that the reporting requirements and Internet disclosure of public information did not resemble imprisonment, which is the "paradigmatic affirmative disability or restraint."[28] The registry (which combined certain sex offenses and kidnapping) imposed requirements that were "less harsh than the sanctions of occupational disbarment . . . ."[29] Those on the registry may attend life events, associate with family and friends, join associations and local groups, and obtain jobs as they choose; nothing in the registry legally prohibits basic life behaviors or interactions.[30] The Supreme Court noted that while some might argue that registries create a public stigma sufficient to make the offender "completely unemployable," the offender's own actions resulted in a public conviction that could be discovered and considered by private citizens, even without a public registry. "[T]he information about the individual's conviction was already in the public domain."[31] The Supreme Court also noted that there was no indication that any of the reporting requirements were in person. However, it did explain that extensive reporting requirements are an inherent part of the regulatory system and do not support a finding of punishment. Notably, after *Smith*, the federal registry required annual and multiannual in-

---

[27] *Id*.

[28] *Id*. at 100.

[29] *Id*.

[30] *Id*.

[31] *Id*. (quotation marks, citation, and emphasis omitted).

person reporting,[32] and federal courts, relying on *Smith*'s reasoning, have resoundingly found

that such requirements do not constitute an affirmative restraint equivalent to punishment.[33]

---

[32] 34 USC 20918.

[33] The United States Court of Appeals for the Tenth Circuit in *Shaw v Patton*, 823 F3d 556, 568-569 (CA 10, 2016), explained the state of the law accurately:

> Other circuits have ordinarily held that in-person reporting requirements are not considered punitive. *See United States v. Parks*, 698 F.3d 1, 6 (1st Cir.2012) (concluding that in-person reporting is inconvenient but not enough to constitute punishment); *Doe v. Cuomo*, 755 F.3d 105, 112 (2d Cir.2014) (holding that a requirement of quarterly in-person reporting is not punitive); *United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir.2013) ("Although [a sex offender] is required under [the Sex Offender Registration and Notification Act] to appear periodically in person to verify his information and submit to a photograph, this is not an affirmative disability or restraint." (citation omitted)); *Hatton v. Bonner*, 356 F.3d 955, 964 (9th Cir.2003) (stating that a California statute's requirement of in-person reporting "is simply not enough to turn [the California statute] into an affirmative disability or restraint"); *United States v. W.B.H.*, 664 F.3d 848, 855, 857–58 (11th Cir.2011) (concluding that a requirement of frequent, in-person reporting is "not enough" to change a statutory regime from civil and regulatory to criminal and punitive). [Alterations by the *Shaw* court.]

See also *Doe v Bredesen*, 507 F3d 998, 1005 (CA 6, 2007) (concluding that 24/7 electronic monitoring, in conjunction with sex offender registration, did not constitute an affirmative restraint or excessive regulation sufficient to create a punitive effect); *American Civil Liberties Union of Nev v Masto*, 670 F3d 1046, 1056-1057 (CA 9, 2012) (reasoning that annual in-person reporting requirements did not support the finding of punishment and noting that "[a]ppearing in person may be more inconvenient, but requiring it is not punitive") (quotation marks and citation omitted). The federal SORNA requires annual in-person reporting, 34 USC 20918, and that statutory scheme has been upheld repeatedly, see, e.g., *Willman v Attorney General*, 972 F3d 819, 825 (CA 6, 2020); *United States v Leach*, 639 F3d 769, 773 (CA 7, 2011); *United States v Elkins*, 683 F3d 1039, 1045 (CA 9, 2012); *United States v Young*, 585 F3d 199, 206 (CA 5, 2009); *United States v Hinckley*, 550 F3d 926, 937-938 (CA 10, 2008). As previously discussed, the United States Supreme Court affirmed the application of SORNA, which included in-person reporting, to military offenses under a similar analysis to *Smith* in *Kebodeaux*, 570 US at 395 (holding that the imposition of a "civil requirement" of registration was "eminently reasonable").

Further, the Supreme Court rejected any comparison of registration to probation or supervised release. The latter categories have "a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction," which would reinstitute imprisonment for the initial criminal judgment.[34] By contrast, offenders on the registry may move, work, and go about their lives as they choose, subject to registration and reporting requirements. The reporting requirements might be extensive, but they nonetheless "make a valid regulatory program effective . . . ."[35] The fact that registrants could be criminally charged for a separate crime for not complying with the registry's requirements did not alter the result.[36]

The Supreme Court addressed the aims of the registry and accepted that it serves to deter future crime. But the Court expressly rejected the argument that the registry is therefore punishment. "Any number of governmental programs might deter crime without imposing punishment."[37] Extended registration based on the seriousness of the crime was not indicative of a retributive purpose but instead was "reasonably related to the danger of recidivism" and "consistent with the regulatory objective."[38]

The Supreme Court's analysis on a rational connection to a nonpunitive purpose and excessiveness in relation to that purpose were combined. It explained that a "*rational* connection

---

[34] *Smith*, 538 US at 101.

[35] *Id*. at 102.

[36] *Id*.

[37] *Id*.

[38] *Id*.

to a nonpunitive purpose is *a most significant factor*" in determining whether a statute is punitive.[39] Registries have a "legitimate nonpunitive purpose of 'public safety, which is advanced by alerting the public to the risk of sex offenders in their communit[y].' "[40] But its application did not require "a close or perfect fit" between the means and ends because imprecision does not make a nonpunitive statute a "sham or mere pretext."[41] The Supreme Court recognized that concerns of recidivism and the offenses those on the registry could commit were legitimate and rational. In so concluding, the Court expressly approved "categorical judgments" for "specified crimes" and expressly rejected the theory that an "individual determination of . . . dangerousness" was required.[42] The public can "assess the risk on the basis of accurate, nonprivate information about the registrants' convictions . . . ."[43] Extensive periods of registration were also rational given the potential for recidivism.[44] The fact that registries are "broadcast" in a universal and "world-wide" manner allowed the registry to *fulfill* its goals of public knowledge and protection.[45] Individuals must take steps to obtain the information, those seeking information are warned that the registry is merely providing public information and that

---

[39] *Id*. (quotation marks, citation, and brackets omitted; emphasis added).

[40] *Id*. at 102-103 (citation omitted; alteration by the *Smith* Court).

[41] *Id*. at 103 (quotation marks and citation omitted).

[42] *Id*. at 103-104.

[43] *Id*. at 104.

[44] *Id*.

[45] *Id*. at 105 (quotation marks, citation, and brackets omitted).

the offenders cannot be subject to criminal actions, and the public is given "available and easily accessible" information.[46]

The Supreme Court explained that the *Mendoza-Martinez* factors considering scienter and whether the behavior is also a crime did not apply to an analysis on registries. The Supreme Court explained: "The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern. The obligations the statute imposes are the responsibility of registration, a duty not predicated upon some present or repeated violation."[47] In conclusion, the Supreme Court emphasized that the question is not "whether the legislature has made the best choice possible to address the problem it seeks to remedy" but whether the "regulatory means chosen are reasonable in light of the nonpunitive objective."[48] This was well in line with the accepted standard that requires "clear proof" that the civil statute is so excessive in effect as to imply that the statute is a subterfuge or disguise for criminal punishment.[49]

Thus, the Supreme Court of the United States thoroughly examined the nature and characteristics of an offender registry and concluded that it was not punishment. The precedent is on all fours with registries throughout the country—and specifically registries that are

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] See notes 17, 19, and 20 of this opinion.

16

consistent with the federal SORNA. Consequently, SORNA, to which Michigan's current registry is almost *identical*, has been universally held to be nonpunitive.[50]

### B. *PEOPLE v BETTS* AND ITS TREATMENT OF *SMITH*

Yet, this Court in *People v Betts* for all intents and purposes ignored *Smith*, and addressed matters that were unnecessary to the essential holding of *Betts*. The decision held that the 2011 version of Michigan's SORA, which had *already been held* to be punishment and unenforceable as to some registrants in federal court, was punishment under the Michigan and United States Constitutions.[51] Notably, the Court's standard did not differ when analyzing the Michigan and federal rights, but the Court's legal reasoning was directly at odds with *Smith* and the *Mendoza-Martinez* standard applied in *Smith*. Much of the analysis in *Betts* was gratuitous. In contrast to our opinion in *Betts*, the United States Court of Appeals for the Sixth Circuit provided a short and tailored analysis that noted the unique attributes of the 2011 Michigan SORA, concluding that it was an uncommon registry that constituted punishment.[52] Of major note, the Sixth Circuit emphasized that offenders were barred from living, working, or loitering within 1,000 feet of a school zone, which served to exclude offenders from performing basic and daily life activities

---

[50] See, e.g., *Willman*, 972 F3d at 825 ("SORNA is not a punishment . . . ."); accord *Leach*, 639 F3d at 773; *Elkins*, 683 F3d at 1045; *Young*, 585 F3d at 206; *Hinckley*, 550 F3d at 937-938.

[51] *Betts*, 507 Mich at 533; *Doe v Snyder*, 449 F Supp 3d 719, 724-726 (ED Mich, 2020) (describing the procedural history and federal injunctions issued); see also *Armstrong v Exceptional Child Ctr, Inc*, 575 US 320, 326; 135 S Ct 1378; 191 L Ed 2d 471 (2015) (reiterating the "long held" law that "federal courts may . . . grant injunctive relief against state officers who are violating, or planning to violate, federal law").

[52] *Does #1-5 v Snyder*, 834 F3d 696 (CA 6, 2016).

in a substantial portion of urban areas.[53]  In addition, the Sixth Circuit noted that offenders were required to report *in person* not just for annual or multiannual registration information, but also for any "even minor change[] to their information," including new cars or new online identifiers.[54]  Further, the 2011 SORA posted categorical risk identifiers based on tiers but did not explain or state that they were not individualized determinations.  Whether this reasoning is correct is beside the point.[55]  What is clearly apparent is that *Betts* went much further than the rationale of the Sixth Circuit and, in so doing, went out of its way to distinguish the clear holdings of *Smith* and well-established federal caselaw.

As to historical precedents, this Court in *Betts* stated that the 2011 SORA bore "significant resemblance" to banishment, which was a colonial punishment that categorically prohibited offenders from ever returning to a community.[56]  Of course, offenders could live and work in the community, just not around common locations where schoolchildren gathered, a population that is especially vulnerable to sex crimes and abuse.  This Court stated that public dissemination on the Internet of detailed information about the offender amounted to "shaming," which was a 1700s punishment whereby offenders were forced to sit in the public square and face public

---

[53] *Id*. at 698, 705.

[54] *Id*. at 705.

[55] Compare *Hope v Ind Dep't of Correction Comm'r*, 9 F4th 513, 519-520 (CA 7, 2021) (en banc) (holding that Indiana's registry, which prohibited types of employment for offenders, publicized categories of crimes calling offenders "sexually violent predators," and barred offenders from living within 1,000 feet of certain locations, was not punishment).

[56] *Betts*, 507 Mich at 553; *Smith*, 538 US at 98 ("The most serious offenders were banished, after which they could neither return to their original community nor, reputation tarnished, be admitted easily into a new one.").

ridicule or be branded with "M" for murderer.[57] This Court explained that whatever "might have been" the case at the time of *Smith*, the 2011 SORA published information on the offender's "home address, place of employment, sex, race, age, height, weight, hair and eye color, discernible features, and tier classification."[58] But this was almost exactly the information available to the public in *Smith*.[59] The Court in *Betts* also improvidently limited *Smith* by comparing the Alaska registry to the act of going to a local records department. But this is, at best, an incomplete understanding of *Smith*. The Supreme Court explained that the registry is of recent creation (therefore less like historical punishments) and is "more analogous" to visiting a records department *than colonial punishments* like public shaming, branding, or banishment.[60] This is because "our criminal law tradition insists on public indictment, public trial, and public imposition of sentence"; the "stigma" produced from public dissemination of the truth is attributable to the criminal act and conviction itself.[61] The United States Supreme Court emphatically recognized the unique attributes of massive publication of registry information on the Internet, which *advance* the "efficacy of the scheme."[62] In stating otherwise, *Betts* marked

---

[57] *Betts*, 507 Mich at 551-552; *Smith*, 538 US at 98-99.

[58] *Betts*, 507 Mich at 551.

[59] *Smith*, 538 US at 91 (stating that the information provided to the public included the offender's "name, aliases, address, photograph, physical description, description, license and identification numbers of motor vehicles, place of employment, date of birth, crime for which convicted, date of conviction, place and court of conviction, length and conditions of sentence, and a statement as to whether the offender or kidnapper is in compliance with [the update] requirements . . . or cannot be located") (quotation marks, citation, and brackets omitted).

[60] *Id*. at 99.

[61] *Id*.

[62] *Id*.

the first separation indicating that public display of truthful information on a criminal defendant's history can be analogized to colonial punishment, notwithstanding *Smith*.[63] According to the United States Supreme Court, "[o]ur system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment."[64] Not so for the Michigan Supreme Court.

As for probation or supervised release, the Court in *Betts* noted that, in addition to the onerous school-zone requirements, the 2011 SORA required annual reporting and the payment of a nominal fee for the costs of maintaining the registry. Given that the United States Supreme Court has expressly held that significant fines,[65] occupational disbarment,[66] and revocation of significant government aid for the needy are not punitive[67]—and no one seriously contends that

---

[63] In fact, the Court relied on a New Hampshire Supreme Court decision that itself thoroughly relied on the *dissent* and nonbinding concurrence in *Smith*. *Betts*, 507 Mich at 551-552, citing *Doe v State*, 167 NH 382; 111 A3d 1077 (2015).

[64] *Smith*, 538 US at 98; *id*. at 101 ("Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record. The State makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant.").

[65] *United States v Ward*, 448 US 242; 100 S Ct 2636; 65 L Ed 2d 742 (1980) (holding that monetary impositions to help defray the costs of a regulatory system were not punishment).

[66] *Hudson v United States*, 522 US 93, 104; 118 S Ct 488; 139 L Ed 2d 450 (1997) (explaining that fines and occupational disbarment did not approach the "clearest proof" necessary to prove a punitive nature).

[67] *Nestor*, 363 US at 620-621 (holding that the choice of Congress to remove social security benefits for those who were in the country illegally was not punitive).

regulatory service fees are punishment[68]—the latter is of little significance. As to the former, the Supreme Court of the United States in *Smith* expressly stated that extensive reporting requirements did not make a registry punitive,[69] and courts have routinely accepted that periodic in-person reporting to confirm identity, location, and appearance as required under SORNA does not prove criminal punishment.[70] And in our modern regulatory state, in-person performance and regulatory compliance checks to effect the public interest are pervasive.[71] This Court in *Betts* emphasized the fact that offenders are subject to criminal punishment for noncompliance, but as the United States Supreme Court stated in *Smith*, registrants who were required to report were not prohibited from making changes, and "any prosecution is a proceeding separate from the individual's original offense."[72] Despite conflicting with *Smith* and the lack of need to include such reasoning given the 2011 SORA was already enjoined under a tailored Sixth Circuit opinion and replaced by the 2021 SORA, these overly broad statements in *Betts* remained.

The *Betts* decision emphasized that the 2011 SORA deters crime. Of course, every regulatory measure designed for public protection, safety, or interest serves to deter abuse by

---

[68] See, e.g., MCL 324.21508 (imposing a regulatory fee on those producing gas to help maintain environmental regulatory oversight).

[69] *Smith*, 538 US at 101-102.

[70] See note 33 (collecting sources on in-person reporting).

[71] See, e.g., MCL 380.1561 (requiring children to attend school); MCL 257.309 (requiring drivers to perform in-person physical driving tests); MCL 289.3123 (requiring in-person inspections of food services); MCL 333.13105 (requiring in-person inspections of tattoo parlors); MCL 333.21513(c) (imposing a duty on hospitals to ensure that physicians have "individual training, experience, and other qualifications" with the provision of medical services to patients); MCL 333.16284 (prohibiting telehealth services if the patient does not consent).

[72] *Smith*, 538 US at 101-102.

preventing it from happening. By imposing regulatory oversight, the government is thereby making it less likely individuals will commit violations, i.e., the government ensures the public is protected from harm. As the Supreme Court of the United States has *repeatedly* observed, "[a]ny number of governmental programs might deter crime without imposing punishment."[73] Everything from administrative regulation and occupational licensing[74] to tax and tort law creates structures and incentives to limit or reduce the incidence of wrongdoing.[75] In fact, the very existence of publicly understood law and a police force may operate as a form of deterrent, even if like the registry, a violation of the law results in criminal prosecution. That does not mean that the existence of a government is a punishment. A primary distinction between governmental systems created to inform the public of convictions and criminal punishment of offenders is the imposition of the system to deter the offender *from committing the initial, registrable offense to begin with*. The 2011 SORA certainly imposed serious burdens on offenders, but in concluding that deterrence was a primary purpose of the law, this Court in *Betts* emphasized the fact that the law was enacted to protect the public from future crime.[76] Yet this is equally true of all registries and practically all regulatory regimes. Protecting the public means preventing further wrongs. And the Supreme Court of the United States has repeatedly stated

---

[73] *Id*. at 102 (collecting sources).

[74] See, e.g., *In re Hocking*, 451 Mich 1, 24; 546 NW2d 234 (1996) ("In assessing the appropriate sanction in judicial disciplinary proceedings, our primary charge is to fashion a penalty that maintains the honor and the integrity of the judiciary, deters similar conduct, and furthers the administration of justice.").

[75] See *Hudson*, 522 US at 105 (explaining that "deterrence may serve civil as well as criminal goals") (quotation marks and citation omitted).

[76] *Betts*, 507 Mich at 556-557 (citing the stated purpose of protecting the public and preventing further crime).

that protecting the public by means of providing accurate information, even if deterring *additional* violations of the innocent, serves a legitimate interest.[77]

*Betts* continued and held that the 2011 SORA was retributive. The Court reasoned that the registry applies "for the sole fact" that the offender committed a crime and emphasized that the registry did not have an individualized risk assessment.[78] But as the Supreme Court of the United States has stated multiple times, registries publish accurate information *about individuals who committed crimes* to protect the public and allow "members of the public [to] take the precautions they deem necessary . . . ."[79] The reasoning in *Betts* undermines the entire purpose and effect of the registry, as well as the basic holdings of *Smith*. Further, *Smith* directly addressed and rejected the argument that the lack of an individualized risk assessment renders a registry

---

[77] *Smith*, 538 US at 99 ("The purpose and the principal effect of notification are to inform the public *for its own safety*, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme . . . .") (emphasis added); *id*. at 101 ("The State makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant."); *id*. at 103 (emphasizing the interest in "public safety" and in enacting measures that respond to the risk of "recidivism" and the "dangerousness" of the offenses).

[78] *Betts*, 507 Mich at 557.

[79] *Smith*, 538 US at 101. In fact, the Supreme Court of the United States in *Smith* expressly stated that the registry's application to behavior already made criminal by another statute is "of little weight." *Id*. at 105. "The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern." *Id*.; see also *Ward*, 448 US at 250 (explaining that a legislature "may impose both a criminal and a civil sanction in respect to the same act or omission" and that placing criminal and civil consequences in "two separate and distinct [statutory] provisions" was significant) (quotation marks and citations omitted).

punishment.[80]  It should be no surprise that this Court did not actually cite the *Smith* decision in providing this logic; it instead cited a nonbinding concurrence that openly disapproved of *Smith*'s logic.[81]  Yet the reasoning in *Betts*, purportedly following the federal standard, remained unaffected.

While stating that the interest in protecting the vulnerable from horrid violations of their persons is rational, "given the low bar,"[82] this Court continued to directly attack the rationality and value of registries applied to advance that interest, all but announcing this Court's policy preferences.  Instead of examining whether there is support for a *rational* nonpunitive purpose that is not excessive, this Court credited defendant's argument that sex offender registries are not effective.  The Court selectively cited two studies that it found helpful, as well as a single United States Department of Justice study that stated that sex offenders do not have higher recidivism rates for all crimes than nonsexual offenders.[83]  That conclusion completely avoids the primary justification for registries: that those committing registerable offenses are far more likely to commit heinous crimes, such as rape, that are significantly underreported and very unlikely to result in convictions.  As the Department of Justice explained in an exhaustive review of the available research, meta-analysis and other studies have repeatedly confirmed that those

---

[80] *Smith*, 538 US at 104 ("The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment . . . .").

[81] *Betts*, 507 Mich at 557-558, citing *Smith*, 538 US at 109 (Souter, J., concurring in the judgment).

[82] *Betts*, 507 Mich at 558.

[83] *Id*. at 560-561.

who commit registerable offenses are *substantially* more likely to commit other forms of abuse.[84] This was true at the time of *Smith*, and it was even true in the United States Department of Justice study cited by *Betts*.[85] The Supreme Court of the United States expressly held that a public registry was "consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class."[86] As the United States Court of Appeals for the Seventh Circuit astutely observed, "parents of young children should ask themselves whether they should worry that there are people in their community who have 'only' a 16 percent or an

---

[84] U.S. Department of Justice, *Sex Offender Management Assessment and Planning Initiative* (March 2017), p 122 (concluding that upward of four times as many registerable offenders committed forms of sexual abuse than the general offender population) (collecting sources), available at <https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/somapi_full_report.pdf> (accessed June 21, 2024) [https://perma.cc/MFM8-4MFJ]; see, e.g., Solicitor General, Government of Canada, *Research Summary: Corrections Research and Development—Child Molester Recidivism* (July 1996), p 1 ("[C]hild molesters had much higher rates of sexual recidivism (35%) than did the nonsexual criminal group (1.5%)."), available at <https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/chld-mlstr/chld-mlstr-eng.pdf> (accessed June 21, 2024) [https://perma.cc/54DT-D6MK]. The recidivism rate of committing other registrable offenses such as sexual abuse often ranges from around 12% to 20%. *Sex Offender Management Assessment and Planning Initiative*, pp 118-119 (collecting sources). The rate of re-perpetration of child abuse is very similar. See, e.g., Potter et al, *Rates and Predictors of Child Maltreatment Re-Perpetration against New Victims and Prior Victims*, 123 Child Abuse & Neglect, Article No. 105419 (2022), pp 7 n 6, 9 (finding a re-perpetration rate of 20%, which is likely a "considerable underestimate").

[85] U.S. Department of Justice, *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14)*, NCJ 251773 (May 2019), p 1 (finding that the rearrest rate of sex offenders was three times higher for sex offenses than other offenders), available at <https://bjs.ojp.gov/content/pub/pdf/rsorsp9yfu0514.pdf> (accessed June 24, 2024) [https://perma.cc/K6LP-74MK].

[86] *Smith*, 538 US at 103.

8 percent probability of molesting young children—bearing in mind the lifelong psychological scars that such molestation frequently inflicts."[87]

Studies vary on the effectiveness of registries for public safety,[88] but they are of less significance given the massive uncertainty and variance in reporting and arresting sexual abusers.[89] But that is not a complete picture of the registry's value. The registry provides people the ability to know the truth about the actions of strangers as well as those in their community—

[87] *Belleau v Wall*, 811 F3d 929, 933-934 (CA 7, 2016) (Posner, J.).

[88] U.S. Department of Justice, *Megan's Law: Assessing the Practical and Monetary Efficacy* (December 2008), p 30 (finding that the pre-registry recidivism rate of 10% for those re-arrested for sex crimes dropped to 7.6% following the implementation of Megan's Law), available at <https://www.ojp.gov/pdffiles1/nij/grants/225370.pdf> (accessed June 24, 2024) [https://perma.cc/C3NN-3SDK]; Washington State Institute for Public Policy, *Sex Offender Sentencing in Washington State: Has Community Notification Reduced Recidivism?* (December 2005), p 1 (finding a 20% drop in violent felony recidivism and a 70% drop in felony sex recidivism after passage of a registry law), available at <https://www.wsipp.wa.gov/ReportFile/919/Wsipp_Has-Community-Notification-Reduced-Recidivism_Report.pdf> (accessed June 24, 2024) [https://perma.cc/B9JE-66LR]; Tewksbury et al, *A Longitudinal Examination of Sex Offender Recidivism Prior To and Following the Implementation of SORN*, 30 Behav Sci & L 308 (2012) (finding a drop in recidivism from 13% to 9.7% after passage of a registry law); Berliner et al, *Sentencing Alternative for Sex Offenders: A Study of Decision Making and Recidivism*, 10 J Interpersonal Violence 487 (1995) (finding a drop in recidivism from 22% to 19% after the enactment of a public notification scheme); Duwe & Donnay, *The Impact of Megan's Law on Sex Offender Recidivism: The Minnesota Experience*, 46 Criminology 411 (2008) (finding 2.3%, 9.6%, and 32.8% recidivism rates for the broad notification, limited notification, and prior-to-notification requirement groups, respectively).

Further, the rates of recorded sexual abuse overall have dropped from 80 and 71 per 100,000 in 1992 and 1993 to 47 and 45 in 2012 and 2013. Federal Bureau of Investigation, Crime Data Explorer <https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/home> (accessed June 24, 2024). The sharp decline in the 1990s does not clearly demonstrate the ineffectiveness of public safety measures.

[89] See, e.g., *Kebodeaux*, 570 US at 395-396 (citing *Smith* and explaining that SORNA was "eminently reasonable" despite "conflicting evidence" and therefore could be applied to military convictions); see also note 4 of this opinion.

people with whom they interact on a daily basis. The registry thus has a basic, inherent value in providing to individuals informed autonomy over their lives. Even if there were no academic studies empirically supporting a cold statistical value of providing individuals the right to choose where to live and send their children to school, or even the right to a public trial or the exclusionary rule, government policies establishing those rights would be completely legitimate and reasonable. The Supreme Court of the United States explained that courts cannot substitute their beliefs on the "best" policy so long as the legislature's choice reasonably advances a rational objective. The lack of a "close" fit does not make a civil purpose a "sham."[90] But not according to this Court under *Betts*, which placed its weight behind selective studies that opposed public registries.

The *Betts* Court reiterated that there was no individualized risk determination, the status on the registry was extended based on the category of crime, and public information allowed for

---

[90] *Smith*, 538 US at 103-105; *Hendricks*, 521 US at 365-366; *Bredesen*, 507 F3d at 1006 (explaining that the role of a court is not to "second-guess the state legislature's policy decision as to which measures best effectuate [the act's regulatory] purpose" but rather to determine whether "the regulatory means chosen are reasonable"); *EB v Verniero*, 119 F3d 1077, 1098 (CA 3, 1997) (stating that just because a party might show that "a more effective predictor might be devised," that does not "make the objective purpose of the predictor adopted a punitive one"); *Masto*, 670 F3d at 1057 (explaining that even if a litigant could show that the methodology of the studies cited in *Smith* was flawed, this does not negate the "legitimate public safety interest in monitoring sex-offender presence in the community"); *Settle*, 24 F4th at 949 ("This inquiry is reminiscent of the rational basis test we have already considered; the Virginia legislature is due our deference, and we may only question their work in rare circumstances. We need only confirm that fit between the purpose and its execution is reasonable."); *Nelson*, 78 F4th at 400 (explaining that "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data" and that courts "defer to . . . legislative findings") (quotation marks and citation omitted) (collecting sources).

"stigma." All of these arguments were directly addressed and rejected in *Smith*.[91] And like most of the excessive reasoning in *Betts*, the arguments would apply to any and all public registries. Given an on-point Sixth Circuit decision that had already ordered the non-enforcement of the 2011 SORA as an ex post facto punishment and given the extensive burdens placed on registrants under that law, unlike other registries, a significant amount of the reasoning in *Betts* was gratuitous and unnecessary. Nonetheless, by undermining the legal rationale for *all* registries, *Betts* is the primary driver of today's decision as well as continued legal uncertainty for registries in our state.

## II. THE AMENDED SORA, KIDNAPPING, AND WRONGFUL IMPRISONMENT

In 2021, the Michigan Legislature responded to *Does #1-5 v Snyder*[92] by amending SORA to address the Sixth Circuit's concerns. The 2021 SORA repealed the statutes prohibiting work, residency, or "loitering" near a school; it eliminated the need to report in person for a change of information; and it removed any public dissemination of "tiers" for offenders, although tiers are an inherent part of the internal operation of registry statutes like the federal SORNA. In all, SORA was amended to almost exactly replicate the federal SORNA. Four months *after* the changes in the 2021 SORA became effective, this Court issued *Betts* discussing the prior, non-

---

[91] *Smith*, 538 US at 98 ("By contrast, the stigma of Alaska's Megan's Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment."); *id.* at 104 ("The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment . . . ."); *id.* ("The duration of the reporting requirements is not excessive.").

[92] *Does #1-5*, 834 F3d 696; see also *Doe v Snyder*, 449 F Supp 3d at 724-726 (enforcing the Sixth Circuit's opinion).

applicable registry. Unsurprisingly, the 2021 SORA was immediately subject to constitutional challenge under the logic of *Betts*. Defendant argued below and the Court of Appeals addressed whether the 2021 SORA was punishment. The Court of Appeals extended the logic of *Betts* in a fairly direct manner to hold that it was punishment.

It is impossible to fully understand the Court of Appeals' conclusion without recognizing the massive departure this Court made from established jurisprudence in its *Betts* decision. The majority opinion today provides this defendant relief by cutting away, yet again, at the registry, purportedly only for those who kidnap, take away, or imprison children. But in doing so, the Court is applying and extending *Betts*, leaving for another day a challenge of the registry as a whole. Almost every piece of material analysis in the majority opinion is a direct extension of *Betts* and, correspondingly, is in direct conflict with *Smith* and established law for registries based on the federal SORNA. The 2021 SORA, like the federal SORNA, is not punishment. As explained by the United States Supreme Court in *Smith*, the registry is a common measure that provides average citizens the right to public conviction records to allow them to make informed decisions regarding those with serious and violent propensities, thereby serving the interests of public safety and enhancing individual autonomy.

First, the majority opinion again repeats the false and "misleading"[93] claim that registries resemble historical forms of punishment, which included such punishments as colonial banishment from local towns, and public shaming, such as branding with iron. Like the federal SORNA, which has resoundingly been approved as nonpunitive, the state registry merely serves to provide accurate information to average citizens to make decisions about their lives. This is

---

[93] *Smith*, 538 US at 98.

not hoisting offenders for scorn and abuse in the town square, stitching a scarlet letter on their clothing, or corporal punishment. "Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment."[94] The fact that local citizens can remain vigilant and seek out that information (even by purposefully requesting updates)[95] does not equate to colonial "shaming."[96] Any shame and stigma that results is a consequence of the actions of the offender and the convictions (which definitionally result from antisocial and highly concerning behavior), not a system created to inform the public of "accurate information" *from the public record*.[97] Notably, the majority opinion totally ignores

[94] *Id*.

[95] Just like informing the public of accurate information about disease outbreaks or license suspensions, even the *unsolicited* provision of registry information has little to do with inflicting public and physically apparent shaming of the 1700s. See 34 USC 20923 (outlining the SORNA requirement of community notification); see also *Masto*, 670 F3d at 1056 ("Active dissemination of an individual's sex offender status does not alter the Court's core reasoning that 'stigma . . . results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public.' "), quoting *Smith*, 538 US at 98; *Verniero*, 119 F3d at 1100-1101 ("In order to provide members of the public with an opportunity to take steps to protect themselves, the government has traditionally published appropriate warnings about a range of public hazards."); MCR 9.119 (requiring that an attorney who has resigned, has been disbarred, has had their license suspended, or is transferring to inactive status provide active notice to all current clients).

[96] Like the registry in *Smith*, the Michigan registry notes that the offenders' information is from public records and clearly warns those who seek out the information: "Extreme care should be exercised in using any information obtained from this web site. Information on this site must not be used to unlawfully injure, harass, or commit a crime against any individual named in the registry or residing or working at any reported address. Any such action could result in civil or criminal penalties." Michigan State Police, *Michigan Sex Offender Registry* <https://mspsor.com/> (accessed June 24, 2024).

[97] *Smith*, 538 US at 98-99 (expressly recognizing that the information can "cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism," but "[o]ur system does not treat dissemination of truthful information in furtherance

the fact that registries are of recent origin thereby weighing *against* the conclusion that registries are akin to punishments from the 1700s.[98] The opinion dances by the subject, instead confusingly claiming that compliance with this basic reasoning of *Smith* would justify an

---

of a legitimate governmental objective as punishment"); see also *Cutshall v Sundquist*, 193 F3d 466, 475 (CA 6, 1999) (explaining that "[n]othing" in a standard registry "imposes restrictions on . . . conduct . . . akin to incarceration or incapacitation" or "force[s] registrants to conform their actions in the way that rehabilitative efforts might" and noting that there is no demonstration that the "dissemination of information has historically been considered punishment"); *Shaw*, 823 F3d at 566-568 (describing in detail the historical roots of banishment which entailed physical and "complete expulsion of an offender from a socio-political community"; noting even strict registries do not prohibit offenders "from even being present in the jurisdiction"); *Millard v Camper*, 971 F3d 1174, 1182 (CA 10, 2020) (stating that "[a]ny attendant 'public shame' or 'humiliation'—even when magnified by the 'reach of the Internet'—is a 'collateral consequence of a valid regulation' " and that alleged consequences in society "did not stem from affirmative state action" but rather "third parties and businesses implementing their own procedures"), quoting *Smith*, 538 US at 99; *Verniero*, 119 F3d at 1099-1100 (reasoning that "[d]issemination of information about criminal activity has always held the potential for substantial negative consequences for those involved in that activity" and that dissemination of accurate public records "constitute[s] [a] far more compelling analog[y] than the stocks, cages, and scarlet letters").

In the face of this overwhelming caselaw rejecting collateral stigma from registration as demonstrative of punishment, the majority opinion cites a case from the Ninth Circuit that held an inmate is entitled to a *hearing* to determine facts necessary for classification and mandated *mental health treatment* of sex offenders in prison, citing a "stigma plus" theory under procedural due process. *Neal v Shimoda*, 131 F3d 818, 827-832 (CA 9, 1997); *ante* at 27. The case has nothing to do with registries being punishment. The Ninth Circuit opinion was issued prior to *Smith* and in fact concludes that the mandates at issue were nonpunitive. *Neal*, 131 F3d at 827-832; see also *Doe v Tandeske*, 361 F3d 594, 597 (CA 9, 2004) (concluding that substantive due-process challenges to registration are foreclosed by *Smith*). To the extent procedural due process is in any way relevant, the Supreme Court of the United States has expressly held that requirements of registration, as compared to fact-finding necessary to determine registration, do not implicate procedural due-process guarantees. *Conn Dep't of Pub Safety v Doe*, 538 US 1; 123 S Ct 1160; 155 L Ed 2d 98 (2003). No procedural due-process claim is before us, as defendant challenges the requirements of registration as punishment. This citation from the majority opinion misses the mark and is highly unpersuasive.

[98] *Smith*, 538 US at 97.

---

31

obviously flawed conclusion that "few—if any—modern penalties" can be punitive.[99] Further, the opinion restates the misleading claim from *Betts* that *Smith* viewed registries as equivalent to public records departments. The Court in *Smith* actually stated that registries are "*more analogous*" to a historical records department than long-discarded punishments such as branding or "forcing an offender to appear in public with some visible badge" like in 1700s Puritan New England.[100] The detailed and widespread availability of information through the Internet was admittedly "greater than anything which could have been [previously] designed,"[101] but that *advanced* the civil interests in public information rather than making the measure punitive.

The majority opinion also makes the flawed assertion that reporting requirements to ensure that the public information is accurate, even if not in person like *Smith*, are indicative of punishment. All registries have reporting requirements, and the registry in *Smith*, like the 2021 SORA, required registrants to update changed information contemporaneously.[102] If it were otherwise, no registry could effectively and properly advance the goal of providing the public access to truthful information. The majority opinion also relies on a claim from *Betts* that making a violation of the registry a criminal offense causes the registry to be punitive. But this is in direct conflict with *Smith*.[103] Just because criminal laws exist to enforce a legislative system

---

[99] *Ante* at 14 n 10.

[100] *Smith*, 538 US at 99.

[101] *Id*.

[102] See Alaska Stat 12.63.010(c) and (d) (1998).

[103] *Smith*, 538 US at 102 (stating that a registrant who "fails to comply with the reporting requirement may be subjected to a criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's original offense"); see also *United States v Felts*, 674

32

does not mean application of the system itself is punishment; taxes, traffic laws, and occupational licensing are not themselves punishments despite the fact that violations of these requirements could result in criminal punishment. And the fact that average citizens can inform the government of violations of law adds absolutely nothing to the inquiry.[104]

The majority opinion also inaccurately equates registration with probation, as did the *Betts* Court. As *Smith* explained, probation involves a government agent immersively *supervising* the offender's behavior, e.g., where the offender may work and what the offender may consume, and the supervisor may revoke the probation and reinstitute imprisonment for the *initial* conviction. The 2021 SORA does not prohibit or place invasive supervision on the permitted behaviors of offenders in a designated government overseer; it merely requires the disclosure of information when the offender chooses to take on certain behaviors, such as relocating their place of residence.[105] The majority opinion does not even acknowledge the difference between supervision and required permissions on one hand and reporting requirements on the other; the assertion that a registrant will interact with the police "more" than

---

F3d 599, 606 (CA 6, 2012) ("SORNA provides for a conviction for failing to register; it does not increase the punishment for the past conviction.").

[104] *Ante* at 15 (discussing "tips" from average citizens).

[105] *Smith*, 538 US at 101-102 (explaining that intricate reporting requirements did not require the offender to "seek permission" and that revocation depends on the existing criminal offense); *Shaw*, 823 F3d at 564-566 (providing exhaustive historical analysis on probation, noting that it has been accompanied with a specific designated officer who oversees the defendant; it included restrictions and permission for basic actions such as where to live and what to consume, probation searches, and requirements of employment; and it involved "revocation" of a "deferred sentence"); *Settle*, 24 F4th at 951 (explaining that "[h]istorically, a probation officer took a far more active role in a probationer's life than simply collecting information for a database") (quotation marks and citation omitted).

a probationer (because the registrant may theoretically change their basic personal information at high frequency) is pure speculation.[106]

The majority opinion incorrectly asserts that simply requiring in-person reporting supports the conclusion that the registry is a punitive affirmative restraint. Periodic reporting is inherent to the registry approved in *Smith*, in-person reporting is a basic part of SORNA, and in-person reporting has been routinely upheld as lacking indications of affirmative restraints, like other civil measures.[107] Registrants "are free to move where they wish and to live and work as other citizens,"[108] and the reporting is not remotely similar to "the paradigmatic affirmative disability or restraint": imprisonment.[109] The Supreme Court of the United States has held that confinement to protect the public in civil commitment proceedings as well as deportation from the country are nonpunitive.[110] The majority opinion discusses the minimal fees to reimburse the state for the costs of maintaining the registry and even postage, which—like any other administrative fees ubiquitous in modern life—do not constitute punishment. For instance, it currently costs $415 per year to be a licensed attorney and $85 to have a jury in circuit court; a driver's license and attendant registration fees can total over $100 per year. But the Supreme Court of the United States has expressly held that civil forfeiture of property and significant civil

---

[106] See MCL 771.3(1)(c) and (2) (stating that probationers must meet with an officer "monthly or as often as the probation officer requires" and allowing numerous programs and impositions).

[107] See notes 33, 50, 69, and 71 (collecting sources); 34 USC 20918.

[108] *Smith*, 538 US at 101.

[109] *Id*. at 100.

[110] *Hendricks*, 521 US 346; *Carlson v Landon*, 342 US 524, 537; 72 S Ct 525; 96 L Ed 547 (1952) ("Deportation is not a criminal proceeding and has never been held to be punishment.").

fines, beyond compensatory fees, are not affirmative restraints.[111] Furthermore, indefinite prohibitions on individuals obtaining a livelihood in a chosen profession are not affirmative restraints.[112] Reporting requirements and dissemination of accurate public information in registries are, in fact, "less harsh."[113] The 2021 SORA, like the federal SORNA, does not come close to traditionally understood physical restraints, nor does it impose any restrictions or prohibitions on daily life and interactions, which have themselves been held to be civil.[114]

---

[111] *United States v One Assortment of 89 Firearms*, 465 US 354, 365-366; 104 S Ct 1099; 79 L Ed 2d 361 (1984) (upholding civil forfeiture for property that was used in violation of the law, even after the defendant was *acquitted* of the underlying criminal charges); *Ward*, 448 US at 250-251 (upholding civil fines as nonpunitive).

[112] *Hudson*, 522 US at 104.

[113] *Smith*, 538 US at 100.

[114] *Id.*; see also *Hope*, 9 F4th at 532-533 (holding that registration, even with physical limitations on life activities, did not approach confinement and did not support a finding of punitive effects through affirmative restraints); *Masto*, 670 F3d at 1056-1057 ("The requirement that sex offenders present themselves for fingerprinting is not akin to imprisonment, and the burden remains less onerous than occupational debarment."); *Cutshall*, 193 F3d at 474 (holding that registration was less of an imposition on rights and abilities than revocation of a driver's license); *Shaw*, 823 F3d at 568-570 (collecting significant caselaw on registry requirements, including in-person reporting, and concluding that it is less onerous than a "lifelong bar on work in an industry"); *Bredesen*, 507 F3d at 1005 (holding that 24-hour GPS monitoring did not weigh in favor of the defendant as an affirmative restraint given the defendant's freedom of action).

In its analysis on excessiveness and reasonableness, the majority opinion cites in passing federal law that requires all sex offenders receive a stamp if they request a passport to provide customs and foreign law enforcement notification of their registration status, as well as federal regulations that permit some registrants to be denied Section 8 housing benefits. 22 USC 212b; 24 CFR 982.553(a)(2) (2023); *ante* at 27. These would be appropriately considered under affirmative-restraints analyses, yet defendant neither cited nor presented any argument as to how these federal laws, applicable to all registries in this country, render SORA punitive. The majority opinion fails to note the Section 8 provision unambiguously applies only to those required to register for life, which therefore (like most registrants) does not apply to defendant. 24 CFR 982.553(a)(2) (2023) (applying only to "lifetime" registrants); see MCL 28.725(11);

35

The majority opinion asserts that registrants could potentially experience negative reactions from third parties due to their knowledge of convictions and the lack of individualized risk assessment, both of which fly headlong into direct and on-point Supreme Court precedent.[115] Notably, not once does the majority opinion cite *Smith* or caselaw universally holding the federal SORNA and similar registries to not be affirmative restraints.[116] And not once does the majority

---

MCL 28.722(r). It is unclear whether the passport stamp would apply to defendant, given that he was the father of the children he victimized. See 22 USC 212b(c); 34 USC 20911(5) and (6). Furthermore, it is well understood that revocation of noncontractual government benefits due to concern about the individual's prior criminal acts, as well as significant financial penalties and even deportation from the country are not punitive in nature or effect. See *Nestor*, 363 US at 617 ("[T]he sanction is the mere denial of a noncontractual governmental benefit. No affirmative disability or restraint is imposed . . . ."); *89 Firearms*, 465 US at 365 (civil forfeiture); *Ward*, 448 US at 250 (fines); *Landon*, 342 US at 537 (deportation); see also *Johannessen v United States*, 225 US 227, 242; 32 S Ct 613; 56 L Ed 1066 (1912) (holding that revocation of citizenship for false statements is not a punishment).

[115] *Smith*, 538 US at 101 ("Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction . . . ."); *id*. at 104 ("[T]he State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions . . . .").

[116] See notes 50 and 108 to 114 of this opinion. The majority opinion cites one case from the Indiana Supreme Court, which the Indiana Supreme Court itself classified as an extreme outlier and has declined to extend several times. *Tyson v State*, 51 NE3d 88, 92 n 2 (Ind, 2016) (noting that the overwhelming majority of state supreme courts have come to the opposite conclusion); *Jensen v State*, 905 NE2d 384, 394 (Ind, 2009) (holding that registration was nonpunitive). It also cites a case from Montana that reviewed a highly restrictive registry that included many of the same invasive requirements used in the 2011 SORA, which the Michigan Legislature subsequently discarded when the statute was amended in 2021. *State v Hinman*, 412 Mont 434, 443-444; 2023 MT 116; 530 P3d 1271 (2023) (noting, for instance, that the statute required in-person reporting within three days for any change of personal information and prohibited certain offenders from "residing near schools, playgrounds, or other locations that serve minors"). In fact, the Montana Supreme Court held that a less-restrictive registry more in line with the national standard was nonpunitive. *State v Mount*, 317 Mont 481; 2003 MT 275; 78 P3d 829 (2003).

opinion address the reality that the registry's information is a *truthful* and *public* record: "accurate, nonprivate information about the registrants' convictions" in a public trial and court of law is not an affirmative restraint sufficient to override the Legislature's choices.[117]

For advancing traditional aims of punishment, the majority opinion cites *Betts*, concluding that because the registry can deter wrongdoing, it is punitive in nature. Yet this is true for every civil regulatory regime created.[118] The effect of publishing information for public use is to provide individuals with knowledge to direct their life choices and prevent abuse or violence. In so doing, the primary design of the registry to enhance public safety is *advanced*. Similarly, there is no merit in the claim that a public registry of convictions amounts to retribution for crimes committed. The argument fails to address the fundamental import of the registry: to provide public information about persons who have definitively *committed crimes* and therefore provide the public with the knowledge to "take the precautions they deem necessary" in response to registrants' proven criminal behavior.[119] Publishing information on categories of crime is "reasonably related" to the regulatory objective; it is not society's retribution for the crime itself.[120]

---

[117] *Smith*, 538 US at 104.

[118] *Id*. at 102 ("Any number of governmental programs might deter crime without imposing punishment."); *Hudson*, 522 US at 102 ("We have . . . recognized that all civil penalties have some deterrent effect."); *Ward*, 448 US at 249-250 (factor did not weigh in favor of violator for serious civil fines); *One Assortment of 89 Firearms*, 465 US at 365-366 (same for seizure of property used in wrongdoing).

[119] *Smith*, 538 US at 101.

[120] *Id*. at 102, 105 (explaining that the registry's application to criminal conduct was of "little weight" given the interest in protecting the public from the offender's future conduct); *Ward*, 448 US at 250 ("We have noted on a number of occasions that Congress may impose both a

As the majority opinion itself admits, instituting a registry for serious crimes involving sexual abuse and children is clearly rationally connected to a nonpunitive purpose, which is "a most significant factor."[121] Yet the majority opinion continues to cite *Betts* for the one-sided citation to certain studies that critique registries.[122] The mere existence of selective studies supporting one side of a debate is totally irrelevant to this Court's inquiry. The body of evidence, both at the time of *Smith* and *Betts*, strongly demonstrates that those who have committed registrable offenses are substantially more likely to commit similar offenses in the future.[123] Sexual abuse and child abuse are severely underreported.[124] And crimes like kidnapping are closely associated with other forms of abuse, even if a prosecutor does not prove that the defendant committed abuse beyond a reasonable doubt.[125] In line with this common understanding and the nature of the offense, "a child cut off by kidnapping from the safety of

criminal and a civil sanction in respect to the same act or omission.") (quotation marks and citation omitted); *Shaw*, 823 F3d at 571-572 (explaining that any deterrent effect does not render it punitive and is not retributive given that it is entirely "consistent with the non-punitive objective of promoting public safety"); *Settle*, 24 F4th at 952-953 (stating that it is "simply not the case" that deterrence and retribution exist to transform registries into punishment considering their effect to provide information " 'reasonably related' " to "community safety"), quoting *Smith*, 538 US at 102; *Masto*, 670 F3d at 1057 (registries have a deterrent effect but "preventing recidivism" is their objective, and applying it to the convicted did not demonstrate "retributive intent"); *Hope*, 9 F4th at 533 (registry requirements did not advance punitive ends "in lieu of the [registry's] obvious aim to protect children") (quotation marks and citation omitted).

[121] *Smith*, 538 US at 102 (quotation marks, citation, and brackets omitted).

[122] See note 88 of this opinion for examples of other studies and analysis that conflict with the perspective of the majority opinion.

[123] Similar recidivism rates exist for child abusers generally. See notes 84 to 87 of this opinion.

[124] See note 4 of this opinion.

[125] See notes 3 and 5 of this opinion.

everyday surroundings is vulnerable to sexual abuse even if the offender's sexual desires are not the motive of the crime."[126]  Indeed, the case inspiring the first modern registry, "the kidnapping of 11-year-old Jacob Wetterling," had "no evidence of sexual assault; the perpetrator simply disappeared with Jacob, and neither has ever been found."[127]

And, contrary to the majority opinion, the role of the registry cannot be reduced to statistics.  It is a basic public service, providing the public the right to know accurate conviction information by which individuals can gain autonomy and direct the course of their daily behaviors.  Considering the wide deference given to policymakers, simply because advocates can cite studies supporting the opposite policy choice does not mean that there is the "clearest proof" that the chosen method is "unreasonable," sufficient to make the purported civil intent a "sham."[128]  Further, the majority opinion notes there are no available studies indicating that the

[126] *Doe v Sex Offender Registry Bd*, 488 Mass 15, 25; 170 NE3d 1143 (2021) (quotation marks, citation, and brackets omitted).

[127] *People v Knox*, 12 NY3d 60, 68; 903 NE2d 1149 (2009).  The majority opinion cited a case from the New York intermediate court that concluded murderers, as opposed to child kidnappers and imprisoners, could not be registered under substantive due process (a theory distinct from a finding of punitive effects).  *People v Diaz*, 150 App Div 3d 60, 67; 50 NYS3d 388 (2017).  Of course, a decision from New York's highest court controls over an intermediate appellate decision, see *Knox*, 12 NY3d at 68, and furthermore, homicide offenses have no application to this case or Michigan's SORA, see *Diaz*, 150 App Div 3d at 67 ("Of great significance, unlike *Knox*, where the Court of Appeals noted studies showing a strong correlation between child kidnapping and sex offenses . . . no similar statistical correlation has been established between child homicide and sex offenses in the record before us.").

[128] See *Smith*, 538 US at 102-103, 105 (quotation marks and citation omitted); see also notes 17 to 20 and 89 to 90 of this opinion (discussing the proper standard of review, second-guessing legislatures, the *Smith* decision, and the reiteration of the reasonableness of registries in the *Kebodeaux* decision).  The majority opinion cites a federal district court that again analyzed a statute with restrictions more extensive than the 2021 SORA and even more restrictive than the 2011 SORA with which the Michigan Legislature dispensed.  See *Reid v Lee*, 597 F Supp 3d 1177, 1184-1186 (MD Tenn, 2022) (prohibitions on residence, employment, " 'be[ing] alone

inclusion of child kidnappers and imprisoners weighs against the need for civil measures of public protection. Given the "heavy burden" placed *on defendant* to provide the "clearest proof" sufficient to override the Legislature's intent, that weighs strongly against a finding of punishment.

The majority opinion wraps up with a strong policy disagreement with the Legislature: concluding that the choice to place child kidnappers and imprisoners on the registry is not in any way a reasonable policy to advance its purposes, thereby making the registry a "sham," "pretext," or "disguised punishment." Unburdened by cited evidence to support its conclusion,[129] the Court apparently is in a better position than the Michigan Legislature, the legislatures in 42 other states, the federal government, and the United States Supreme Court in *Smith* (which considered a registry that included kidnappers) to weigh the costs and benefits of registration. The majority

with a minor,' " and 48-hour in-person reporting) (citation omitted); *ante* at 26. Any broad statement taken from that district court opinion must be understood in the context to which that court expressly directed its analysis, i.e., prohibitions on offenders "liv[ing] or work[ing] near a school," *Reid*, 597 F Supp 3d at 1199, and in the context of broader Sixth Circuit caselaw, which has held a Tennessee registry even more restrictive than the 2021 SORA to be nonpunitive, *Bredesen*, 507 F3d 998 (even with constant electronic monitoring), and has flatly rejected the argument that the federal SORNA is punishment, *Felts*, 674 F3d at 606. See *Doe v Lee*, 102 F4th 330, 338-339 (CA 6, 2024) (holding that any holding on the basis of punitive effects against that Tennessee registry at issue in the district court case could only be placed against the highly restrictive provisions found punitive in the 2011 Michigan SORA).

[129] For instance, for all of its reliance on selective social studies to support its legal conclusions, the majority opinion fails to cite any evidence for the bald assertion that "the public is unlikely to differentiate between sexual and non-sexual offen[ses] . . . ." *Ante* at 27. This is despite the fact that the offender's crime is unambiguously and accurately stated on the public registry, which the public would need to search in order to discover the offender's name on the registry. Of course, kidnapping and imprisonment of a child are heinous crimes that are rationally viewed by the Legislature as highly problematic as it pertains to the risk of recidivism and the protection of children from abuse. And resulting stigma from the distribution of helpful public safety information through a registry is attributable to the offender's criminal conduct; it does not make a registry punitive. See note 97 of this opinion.

opinion provides its one-sided perspective that the government is "labeling" and "branding" kidnappers and imprisoners.[130] The majority opinion conspicuously fails to include that the information on the registry merely states *accurate* information on the offender's *public* convictions. In so doing, the opinion totally ignores the obviously strong public interest in ensuring the safety of children from significantly underreported yet heinous crimes, as well as the profound interest in entrusting citizens with knowledge to make their own life decisions.[131] It is entirely inconsistent with *Smith* and the courts reviewing SORNA that have concluded registry reporting requirements are not extreme or excessive. The majority opinion fails to cite a single case in this country that has held a registry to be punitive based solely or primarily on the inclusion of crimes such as kidnapping or child imprisonment, despite such policies being in existence since the beginning of modern registries.[132] That is because there are none.

---

[130] See, e.g., *ante* at 17, 27.

[131] As explained in the analysis on cruel or unusual punishment, kidnapping and child imprisonment are in fact some of the most serious and abusive crimes included on Michigan's registry.

[132] The majority opinion heavily relies on out-of-state cases and quotations that are taken outside their relevant legal context. Applying more than a surface-level review of those cases demonstrates that they are inapplicable to the question of whether a SORNA-modeled registry is punitive, and nonetheless, they are highly unpersuasive. See, e.g., notes 97, 116, 127, 128, and 133 of this opinion. Like its analysis on social studies, the majority opinion also ignores evidence of a contrary position, such as the massive body of out-of-state caselaw. Compare, in the context of due-process challenges, *Doe*, 488 Mass at 24 ("[T]he inclusion of child kidnapping among the offenses requiring registration is still reasonably related to such an objective, given the correlation between child abductions and sexual assault undergirding the Federal law"); *Knox*, 12 NY3d at 69 ("It could rationally have found that the administrative burden, and the risk that some dangerous sex offenders would escape registration, justified a hard and fast rule, with no exceptions."); *State v Smith*, 323 Wis 2d 377, 406-407; 2010 WI 16; 780 NW2d 90 (2010) ("Because of an offender's control over the whereabouts of the child, the victim of a false imprisonment is in a vulnerable position. It is reasonable that the public not be at risk that some dangerous sex offenders would escape registration, particularly those who falsely imprison a

This Court's policy preferences are not any more "reasonable" than those of the democratically elected legislatures of almost every American jurisdiction, and there is nowhere near the "clearest proof" of irrationality so as to make them a "sham" or "disguised punishment," as is required under well-accepted law to declare a statute punitive notwithstanding the Legislature's intent.[133] The reasoning in the majority opinion is dismissive of the valid concerns

minor.") (quotation marks and citation omitted); *People v Johnson*, 225 Ill 2d 573, 591; 870 NE2d 415 (2007) ("Our General Assembly . . . recognized that aggravated kidnapping can be a precursor to sex offenses against children."); *State v Coleman*, 241 Ariz 190, 195; 385 P3d 420 (App, 2016) ("Ensuring [the state's] registration scheme is not under-inclusive is rationally related to the state's legitimate interest in protecting its communities . . . .") (quotation marks, citation, and brackets omitted); *Moffitt v Commonwealth*, 360 SW3d 247, 257 (Ky App, 2012) ("Moreover, even though the registry itself is often denoted by the Commonwealth as the 'sex offender registry,' the information available to the public correctly lists the exact crime [the defendant] was found guilty of committing, kidnapping.") (quotation marks and citation omitted); see also *Tyson*, 51 NE3d at 92 n 2 (noting the "overwhelming[]" number of state court decisions, not including federal and SORNA caselaw, holding registries to be nonpunitive and citing examples from around the country).

[133] *Smith*, 538 US at 103-105; *Hendricks*, 521 US at 365-366; *Allen*, 478 US at 373 (discussing whether the effects of a commitment statute were "incompatible with the State's asserted interest"); *Nestor*, 363 US at 619 (explaining that the effects of a statute did not "evidence [a] punitive intent"); see also notes 17 to 20 and 89 to 90 of this opinion (discussing the proper standard of review, second-guessing legislatures, the *Smith* decision, and the reiteration of the reasonableness of registries in the *Kebodeaux* decision). That is the standard under established law to find that a policy is unreasonably "excessive" and punitive, despite the Legislature's civil intent. The Court in *Smith* combined together its analysis on the purpose and excessiveness of registries, just as a court reviews both the means and ends of a statute under rational-basis review. *Smith*, 538 US at 103-105. And the Supreme Court of the United States unambiguously stated in *Smith* that a statute is not a "sham or mere pretext" in regard to excessiveness if the "*means* chosen are *reasonable* in light of the nonpunitive objective," even if the policy "lacks a close or perfect fit" to its purposes. *Id*. (quotation marks and citation omitted; emphasis added). If the majority opinion views this restatement of basic caselaw as "disingenuous" or "sensationalism," that demonstrates either a lack of complete understanding of relevant jurisprudence or a willful indifference to it. *Ante* at 28 n 19. See also *Kebodeaux*, 570 US at 395-396 (connecting *Smith* and its analysis on registries to rational-basis review and reasonableness); *Settle*, 24 F4th at 949 (same); *Nelson*, 78 F4th at 400 (same); *Bredesen*, 507 F3d at 1006-1007 (explaining that the role of a court is not to "second-guess the state legislature's policy decision as to which measures

best effectuate that purpose" instead of determining whether "the means chosen are reasonable"); *Doe v Miller*, 405 F3d 700, 721 (CA 8, 2005) (interweaving the analysis on the purposes and means of a registry); *Verniero*, 119 F3d at 1099 (considering whether there is "a reasonable 'fit' between end and means"); *Hendricks*, 521 US at 364-368 (providing a combined analysis on the reasonable relation of the statute to its purposes of treatment); compare *Armour*, 566 US at 685 (applying rational-basis review).

The majority opinion provides alternating positions to avoid the analysis in *Smith*. On the one hand, the majority opinion implies that *Smith*'s language requiring a "sham or mere pretext" is not supported by a majority of the justices of the Supreme Court of the United States. *Ante* at 28 n 19. That is flatly incorrect. On the other hand, the majority opinion implies, in contradiction with the first point, that it can ignore the express language of the Supreme Court because the statement is a "singular and brief endorsement." *Ante* at 29 n 19. Finally, in conflict with both these positions, the majority opinion advances a claim that *Smith*'s language can be ignored because a lower standard, which was not stated or applied in *Smith*, could nonetheless govern. *Ante* at 28 n 19. *Smith* itself was a majority opinion that adopted the "sham or mere pretext" analysis, and the standard fits well in line with other well-recognized restatements of this law. The Supreme Court of the United States has repeatedly described a finding of punitive effects in markedly skeptical terms, such as "overrid[ing]" the Legislature's intent, *Hudson*, 522 US at 100, "transform[ing] what was clearly intended as a civil remedy into a criminal penalty," *Ward*, 448 US at 249 (quotation marks and citation omitted), permitted with "[o]nly the clearest proof," *89 Firearms*, 465 US at 365 (quotation marks and citation omitted), and a "heavy burden" amounting to a finding of "disguised punishment," *Hendricks*, 521 US at 361, 365. Therefore, putting aside the fact that it is in fact a majority opinion, the requirement of a "sham or mere pretext" in *Smith* is by no means a departure from this law. The majority opinion does not rely on this applicable caselaw but instead cites as a counterargument *Rex Trailer Co v United States*, 350 US 148; 76 S Ct 219; 100 L Ed 149 (1956), a Supreme Court decision from the 1950s. In that case, the Court rejected a claim that the government's recovery of liquidated damages was a punitive measure. *Id*. at 154. The decision in no way discussed or analyzed the *Mendoza-Martinez* factors applicable in this case; it was published years before *Mendoza-Martinez* was even decided. The Court in *Rex Trailer Co* provided very little substantive analysis and resolved the dispute prior to any of the relevant caselaw cited above and most notably, *Smith*. *Id*. Even so, the majority opinion conspicuously fails to cite the complete quotation from *Rex Trailer Co*, which stated that the measure of recovery was not "*so unreasonable or excessive* that it transformed" a civil measure into criminal punishment. *Id*. at 154 (emphasis added); *ante* at 29 n 19. That is by no means a rejection of modern and applicable caselaw, and it is completely unsurprising that the Supreme Court of the United States does not view it as such.

It should go without saying that unambiguous language in a majority opinion cannot be ignored simply because it cites or quotes analysis from a prior concurrence and asserts it as its

own, which happens routinely in judicial decision-making. See, e.g., *Miller v Alabama*, 567 US 460, 475, 481; 132 S Ct 2455; 183 L Ed 2d 407 (2012) (repeatedly quoting concurrences when providing its own reasoning on cruel and unusual punishment); *Harper v Va Dep't of Taxation*, 509 US 86, 98-99; 113 S Ct 2510; 125 L Ed 2d 74 (1993) (repeatedly quoting concurrences and dissents to establish the federal retroactivity standard); *NY State Rifle & Pistol Ass'n, Inc v Bruen*, 597 US 1, 36; 142 S Ct 2111; 213 L Ed 2d 387 (2022) (repeatedly quoting concurrences for the proper interpretation of the Second Amendment); *City of Richmond v JA Croson Co*, 488 US 469, 500; 109 S Ct 706; 102 L Ed 2d 854 (1989) (quoting a plurality opinion for a controlling standard in certain Voting Rights Act litigation); see also, e.g., *Hope*, 9 F4th at 534 (citing the unambiguous statements in *Smith*); *Johnson v Quander*, 370 US App DC 167, 180; 440 F3d 489 (2006) (same). A "singular and brief endorsement," in the words of the majority opinion, could equally apply to fundamental principles of law in the context of the right to counsel, *Powell v Alabama*, 287 US 45, 57; 53 S Ct 55; 77 L Ed 158 (1932) (discussing a "critical period of the proceedings"), police searches, *Silverthorne Lumber Co v United States*, 251 US 385, 392; 40 S Ct 182; 64 L Ed 319 (1920) (mentioning the "independent source" of the discovery), and modern formulations of constitutional scrutiny, *Palmore v Sidoti*, 466 US 429, 432; 104 S Ct 1879; 80 L Ed 2d 421 (1984) (referencing "compelling governmental interest[s]"), to name just a few.

In all such circumstances of jurisprudential development, the Supreme Court of the United States provided reasoning that controlled the outcome of the case, and subsequently, courts cited the reasoning provided and applied it to the cases before them. This is at the foundation of the judicial decision-making process. The Supreme Court stated that overriding a legislature's civil intent was akin to holding that its statutory scheme was a "sham or mere pretext" for punishment. *Smith*, 538 US at 103 (quotation marks and citation omitted). Further, that analysis was not provided in a passing footnote or in dicta; it was provided in a description of the applicable law to find punitive effects. *Id*.; see, e.g., *Wold Architects & Engineers v Strat*, 474 Mich 223, 232 n 3; 713 NW2d 750 (2006) ("The issue presented in [a prior decision] was whether the arbitration agreement between the parties was enforceable. Thus, a statement of the law regarding the enforceability of a common-law arbitration agreement was necessary to the determination of the case [and applicable]."). The Court in *Smith* then applied this reasoning to the exact same legal claim at issue here, i.e., it explained that the plaintiff *did not* demonstrate that the professed civil intent amounted to a "sham or mere pretext" and the claim that a public registry was punitive *failed*. *Smith*, 538 US at 103 (quotation marks and citation omitted). A lower standard could have been dispositive in *Smith*. Yet not once did the Supreme Court state that the standard it applied was not actually the standard required under the law, as the majority opinion now claims. *Ante* at 29 n 19. The majority opinion fails to cite a single case that has agreed with its position on *Smith*, perhaps other than *Betts*, nor has it cited a case that has applied similar reasoning to a controlling decision in any other legal context. Courts apply the law; they are not tasked with listing alternative standards that are not used and do not govern. Ultimately, this Court cannot ignore on-point caselaw simply because, in the view of the majority opinion, it is unfavorable or otherwise detracts from its conclusions.

of millions of parents. It nullifies the work of the Legislature and elevates the policy choices of this Court.[134]

Contrary to the analysis in the majority opinion and in line with the thorough analysis in *Smith*, consideration of the *Mendoza-Martinez* factors decisively leads to the conclusion that the extraordinary burden of proving SORA is a "sham" or "disguised" punishment has not been met. Review of historical forms of punishment, the existence of affirmative restraints, promotion of traditional methods of punishment, and reasonable advancement of a nonpenological objective all together lead to the conclusion that SORA is a valid civil measure for public knowledge and protection, in accordance with the Legislature's intent.[135]

---

[134] Notwithstanding the fact that the majority opinion declares unconstitutional the work of the Legislature, the majority opinion implies that this dissent, rather than the majority opinion, is advancing its preferred policy positions. *Ante* at 26 n 18. It suffices to note that the dissent does not conclude that the policy of the Legislature is an unreasonable sham under applicable law, *Smith*, 538 US at 104-106; the majority opinion does. Whether or not the public policy clearly supported *by the majority opinion* is a reasonable civil measure is not a question before us, given that the Legislature did not enact those preferences into statute. However, if that policy were enacted, it would be extraordinarily difficult for a challenger to demonstrate that the majority opinion's policy preferences were not reasonably related to a legitimate government purpose.

[135] The legally unjustified holding that SORA is punitive has major consequences, and it is difficult to see how today's holding can be limited "just" to offenders such as those that kidnap or imprison children. Convictions can be wholesale overturned because the defendant was not adequately informed of the direct punitive consequences of his plea. See *Dalton v Battaglia*, 402 F3d 729, 733-734 (CA 7, 2005) (explaining that "direct consequences" include the actual punishment the defendant "may serve as a result of [the] plea"); *Hall v Gainsheimer*, 137 F Appx 866, 869 (CA 6, 2005) (stating that "a judge-imposed punishment made part of [the defendant's] sentence" was a direct consequence of a plea); but see *Chaidez v United States*, 568 US 342, 349 n 5; 133 S Ct 1103; 185 L Ed 2d 149 (2013) (naming "civil commitment, civil forfeiture, *sex offender registration*, disqualification from public benefits, and disfranchisement" as commonly understood collateral consequences) (emphasis added); accord *Virsnieks v Smith*, 521 F3d 707, 716 (CA 7, 2008). Further, the state could be prohibited from enacting or enforcing *any* new requirements for the substantial majority of offenders whose convictions occurred prior to the enactment. The registry added a public website in the late 1990s, and as part of a nationwide

## III. DEFENDANT'S REGISTRATION AS CRUEL OR UNUSUAL PUNISHMENT

Given that a public registry is designed and administered to provide the public accurate information and to ensure public protection, it is a serious misnomer to consider questions implicated in a claim of cruel or unusual punishment. The claim requires balancing and review of the purported punishment with the seriousness of the offense, as well as a consideration of "modern policy factors underlying criminal penalties" such as rehabilitation and deterrence.[136] Yet registries are not designed to punish the offender for wrongdoing; they have little focus in rehabilitation, nor are their dominant design and effects related to deterrence from committing the initial offense. In a material way, legislatures are caught in a Catch-22 as to these penological

---

movement led by the federal government, Michigan included new requirements to disclose Internet identifiers that the offender could use as well as reporting requirements for international travel in 2011. All changes since the initial registry could be subject to attack as ex post facto punishment, thereby excluding entire swaths of offenders from basic public safety reforms. See *Cal Dep't of Corrections v Morales*, 514 US 499, 506 n 3; 115 S Ct 1597; 131 L Ed 2d 588 (1995) (explaining that a state cannot impose a new "penalty by which [the] crime is punishable"). Moreover, every registration would be subject to litigation and intricate court balancing under the now-lowered cruel or unusual punishment clause of the Michigan Constitution, as discussed in the next section of this opinion. Finally, it is well accepted that states cannot impose punishments for out-of-state crimes. See *Nat'l Pork Producers Council v Ross*, 598 US 356, 375; 143 S Ct 1142; 215 L Ed 2d 336 (2023) (explaining that one state cannot "prosecute the citizen of another State for acts committed outside the first State's jurisdiction") (quotation marks, citation, and brackets omitted); see also *Heath v Alabama*, 474 US 82, 88; 106 S Ct 433; 88 L Ed 2d 387 (1985) (reasoning that two states can punish an individual for the same conduct, but the separate punishments are for "two distinct" offenses under the Double Jeopardy Clause); *Apprendi v New Jersey*, 530 US 466, 478; 120 S Ct 2348; 147 L Ed 2d 435 (2000) (stating that a criminal punishment cannot be imposed without providing the right to a "jury verdict based on proof beyond a reasonable doubt"). It is difficult to see how an in-state punishment of public registration could be imposed for *any* out-of-state offenses. Undoubtedly, a registry laced with holes, omissions, and incomplete information will only undermine its interests of community protection as well as the value and consistency upon which the public can rely, which will only further erode its constitutional validity.

[136] *People v Lorentzen*, 387 Mich 167, 180; 194 NW2d 827 (1972).

objectives. While treatment and personal development may advance rehabilitation, mandating such services or behaviors would weigh in favor of the statute's punitive effect as an affirmative restraint. Comparison of a public information registry to punishment is inapt and misframes the issue from the start.

Nonetheless, it is worth noting that allowing the public to access accurate information of defendant's convictions with occasional reporting requirements, which impose no restrictions on the defendant's residence, employment, behaviors, or associations, does not even approach cruel and unusual punishment under the Eighth Amendment. Defendant tortured and imprisoned two children and a woman for hours over the course of a night, repeatedly threatening to kill them with a firearm, forcing them to kneel at a fireplace, and restraining them while they awaited potential death and screamed for mercy. Given the heinousness of the crime, the fact that those who imprison or kidnap children have the proven tendency to commit abuse, the potential harm if defendant yet again commits a child abuse offense, and the fact that child abuse generally is very underreported, providing the public basic information on defendant does not even approach the "rare" and "extreme" cases in which the sentence is "grossly disproportionate" to the crime.[137] Further, the Supreme Court of the United States has specifically held that the lack of an "individualized" risk assessment is not relevant to the inquiry.[138] As a federal court in Michigan astutely observed, "[i]f life imprisonment without any possibility of parole for a non-

---

[137] See *Hutto v Davis*, 454 US 370, 374; 102 S Ct 703; 70 L Ed 2d 556 (1982) (explaining that cruel and unusual punishments, given deference to legislatures, are "exceedingly rare"); *Ewing v California*, 538 US 11, 23; 123 S Ct 1179; 155 L Ed 2d 108 (2003) (plurality opinion) (explaining that the Eighth Amendment does not require "strict proportionality" and forbids only "extreme sentences that are grossly disproportionate to the crime") (quotation marks and citation omitted).

[138] *Harmelin v Michigan*, 501 US 957, 995; 111 S Ct 2680; 115 L Ed 2d 836 (1991).

violent offense [such as distribution of cocaine] is not cruel and unusual punishment," even intensive registration requirements for violent offenses are "not cruel and unusual punishment."[139]

Although it is seriously questionable whether Michigan's Constitution differs from its federal predecessor,[140] Michigan caselaw performs a unique comparative analysis to punishments within and without Michigan. Ironically, this is based on then-contemporary, yet now antiquated, adoption of federal legal standards stated in *Weems v United States*, 217 US 349; 30 S Ct 544; 54 L Ed 793 (1910). Since 1910, *Weems* has been clarified and refined by the Supreme Court of the United States. Now, federal courts do not perform a comparative analysis on policies unless an extraordinary demonstration is made that the punishment and the offense are on their face grossly disproportionate.[141] Nonetheless, in Michigan, the historical standard adopted from archaic federal law remains.

---

[139] *Smith v Bauman*, unpublished opinion and order of the United States District Court for the Eastern District of Michigan, issued March 19, 2018 (Case No. 5:10-cv-11052), p 5; accord *Noonan v Burton*, unpublished opinion of the United States Court of Appeals for the Sixth Circuit, issued October 15, 2018 (Case No. 17-2458), p 3; see *Harmelin*, 501 US at 961, 994-996 (holding that a mandatory sentence of life in prison without the possibility of parole for the possession of cocaine was constitutional); *Hutto*, 454 US at 370, 374-375 (holding that a 40-year minimum sentence for the possession and distribution of nine ounces of marijuana was constitutional); *Ewing*, 538 US at 30-31 (holding that 25 years' to life imprisonment for stealing golf clubs under a three-strikes law was constitutional); *Rummel v Estelle*, 445 US 263, 265-266, 285; 100 S Ct 1133; 63 L Ed 2d 382 (1980) (holding that life imprisonment with the possibility of parole for the commission of three felony frauds totaling around $230 over the course of 9 years was constitutional).

[140] See *People v Stovall*, 510 Mich 301, 341 n 24, 343 n 25; 987 NW2d 85 (2022) (ZAHRA, J., dissenting).

[141] See *Harmelin*, 501 US at 1005 (Kennedy, J., concurring in part and concurring in the judgment) ("[I]ntrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to

Public registration does not approach the imposition and burdens imposed by incarceration for any material length of time. For instance, it imposes no mandates on where to live, what to drink, with whom to associate, and whether and where to work. No jailor controls whom you can access, what you can eat, and the extent to which your daily life is lived outside of the four walls of a prison cell. Registrants are not required to obtain permission for any daily or major life events. Simply requiring offenders to register and provide accurate information to the government and having this accurate information publicly available is not punishment, and it is neither cruel nor unusual. To conclude otherwise is to dismiss the reality of the serious punishments regularly issued for similar offenses and the significant interests in public safety served by a registry.

Defendant's actions resulted in a conviction for unlawful imprisonment, which is a felony that is punishable by imprisonment for not more than 15 years or a fine, or both.[142] That is not remotely comparable to registration and public access to defendant's conviction history for 15 years, which is already a matter of public record available via a name search and even court opinions (including this one).[143] Michigan mandates public registration for far less-serious

an inference of gross disproportionality."); *United States v Moore*, 643 F3d 451, 456 (CA 6, 2011) (rejecting an Eighth Amendment claim because a "threshold comparison" of the gravity of the defendant's offense and the severity of the sentence "did not reveal an inference of gross disproportionality") (quotation marks and citation omitted).

[142] MCL 750.349b.

[143] *Smith*, 538 US at 100 ("The Act imposes no physical restraint, and so does not resemble the punishment of imprisonment . . . ."); *Cutshall*, 193 F3d at 474 ("[The registrant] need only notify the [Tennessee Bureau of Investigation] where he lives, where he works, and other basic data. He is free to live where he chooses, come and go as he pleases, and seek any employment he wishes. Neither are the public notification provisions tantamount to imprisonment."). For instance, case records can be found here: Third Judicial Circuit of Michigan, *Odyssey Public*

crimes that carry significantly lower punishments, including four years' imprisonment for possession of child pornography, MCL 750.145c(4)(a); two years for indecent exposure, MCL 750.335a(2)(b); five years for engaging the services of or offering to engage the services of an underage prostitute, MCL 750.451(4); two years for criminal sexual conduct (CSC) in the fourth degree, MCL 750.520e(2); five years for assault with intent to commit second-degree CSC, MCL 750.520g(2); two years for surveilling a child undressing, MCL 750.539j(2)(a)(*i*); and not more than 180 days' imprisonment for almost all violations of a municipal ordinance involving a sexual offense against a minor.[144]   The following offenses are less serious than wrongful imprisonment yet are subject to 10 more years of registration:[145] four years' imprisonment for soliciting a child for immoral purposes, MCL 750.145a; 10 years for soliciting a child for immoral purposes, second offense, MCL 750.145b; seven years for distribution of child pornography, MCL 750.145c(3)(a); four years for using electronic means to solicit a child, MCL 750.145d(2)(c); 93 days for soliciting to commit a lewd or immoral act, MCL 750.451(1); two years for fourth-degree CSC involving a young child, MCL 750.520e(2); and five years for assault with intent to commit CSC on a young child, MCL 750.520g(2).  Sodomy and third-degree CSC are both punishable for the same time of 15 years' imprisonment, but both require 10 more years of registration, MCL 750.158 and MCL 750.520d(2); certain CSC offenses

---

*Access (OPA)* <https://www.3rdcc.org/odyssey-public-access-(opa)> (accessed June 25, 2024). Appellate court opinion searches can be conducted here: Michigan Courts, *Cases, Opinions & Orders* <https://www.courts.michigan.gov/case-search/> (accessed June 25, 2024).

[144] See MCL 117.3(k); MCL 117.4i(k); MCL 42.21(5); see also *Huron Twp v City Disposal Sys, Inc*, 448 Mich 362, 365; 531 NW2d 153 (1995) (holding that even with the potential for jail time, ordinance prosecutions are generally not considered criminal under Michigan statutes and rules).

[145] For a list of offenses and their registration time requirements, see MCL 28.722(q) to (u) and MCL 28.725(11) to (13).

against minors are subject to not more than five years' imprisonment but require registration for life, MCL 750.520g(2).

For offenses analogous to defendant's conduct and offense, a defendant is subject to life imprisonment for the intentional infliction of serious mental harm on a child, MCL 750.136b(2); 15 years' imprisonment for the intentional infliction of serious mental harm on a vulnerable adult, MCL 750.145n; 10 years' imprisonment for assault with intent to cause great bodily harm, MCL 750.84; and up to 10 years' imprisonment for carrying or possessing a firearm when committing or attempting to commit a felony, MCL 750.227b, depending on prior criminal history. Kidnapping and abducting children are punishable by life imprisonment and lifetime registration. MCL 750.349; MCL 750.350.[146] In all, registration for defendant's actions and convictions is not remotely unusual, abnormal, or excessive for penalties in Michigan, and in fact defendant's actions constitute one of the most serious crimes on the registry.

Interjurisdictional considerations fare no better for defendant. In all, an overwhelming 42 statutes from other states and the federal government have public registration of offenses like wrongful imprisonment and kidnapping that do not per se have a sexual element. There is absolutely no indication that any of these registries mark a substantial departure from the national standard, which Michigan's SORA emulates. Of course, as the party challenging the constitutionality of a public law and working statutory system, the burden is on defendant to make that case.[147] It suffices to note that, upon a review of those statutes, every sex offender

---

[146] Other very serious crimes, like first-degree CSC, are on the registry and punishable by life imprisonment. MCL 750.520b.

[147] See *ante* at 35-37 (concluding that "defendant's punishment is not grossly disproportionate" considering other jurisdictions, even though the majority opinion states that it lacks access to

51

registry listed contains detailed disclosure, reporting, and registration requirements analogous to Michigan's SORA, and the vast majority have in-person elements. Further, every single state listed has a publicly available registry via the Internet. Some go even further, imposing, for instance, unsolicited community notifications and public signage for neighbors[148] or severe restrictions on employment and residence.[149]

Michigan's registration is routine in its inclusion of an offense subject to 15 years' imprisonment, and states around the country regularly prescribe serious punishments for child abuse, seizure, and confinement.[150] Further, only two of our sister state courts have agreed that any form of registration can violate prohibitions on cruel or unusual punishment, and both of the

---

sufficient information about them); *In re Request for Advisory Opinion*, 479 Mich 1, 11; 740 NW2d 444 (2007) ("A statute challenged on a constitutional basis is clothed in a presumption of constitutionality, and the burden of proving that a statute is unconstitutional rests with the party challenging it.") (quotation marks and citation omitted) (collecting sources); *People v Piasecki*, 333 Mich 122, 144; 52 NW2d 626 (1952) (requiring proof of unconstitutionality to be presented "clearly" or "beyond a reasonable doubt"); see, e.g., *People v Hall*, 396 Mich 650, 658; 242 NW2d 377 (1976) ("[T]he punishment exacted is proportionate to the crime. Defendant has not contended that Michigan's punishment for felony murder is widely divergent from any sister jurisdiction.").

[148] E.g., Ohio Rev Code Ann 2950.11 (applicable to kidnappers).

[149] E.g., Ind Code 35-42-4-11 (applicable to kidnappers).

[150] Michigan's unlawful-imprisonment offense requires criminal conduct in addition to mere restraint, including the use of a "weapon or dangerous instrument." MCL 750.349b; see note 14 of this opinion (comparing the offense to Alaska's kidnapping offense in *Smith*); compare Ohio Rev Code Ann 2905.03 (requiring only the "knowing[] restrain[t]" of another person's "liberty"). It is not seriously disputed that jurisdictions around the country routinely punish this behavior with significant penalties. E.g., Ind Code 35-42-3-2 (explaining that a similar kidnapping crime can be a felony punishable with a maximum imprisonment of 16 or 30 years); Ind Code 35-46-1-4 (classifying severe child abuse without death as punishable with up to 16 years' imprisonment); Ind Code 35-50-2-0.1 *et seq.* (describing the penalties for each category of felony); 18 USC 1201 (permitting imposition of life imprisonment for similar acts of kidnapping and a mandatory minimum of 20 years' imprisonment for child kidnapping).

decisions involved *lifetime* registration for *juvenile* offenders.[151]  The overwhelming majority of jurisdictions, including the federal courts, have rejected such arguments.[152]  A prohibition on registration as cruel or unusual punishment is an extreme outlier in the United States.  Extending such a holding to a matured adult offender who victimized a child, and to attendant registration requirements lasting 15 years, is unprecedented in this nation.  The Legislature, SORA, and SORNA are not on the outer periphery of accepted law; the majority opinion is.

Given the heinous nature of defendant's actions and the profound harm that could be inflicted if he reoffends, Michigan's SORA requires registration for the offense, and the level of punishment decisively weighs in favor of constitutionality.[153]  "[P]olicy factors underlying

---

[151] *In re TB*, 489 P3d 752; 2021 CO 59 (Colo, 2021); *In re CP*, 131 Ohio St 3d 513; 2012-Ohio-1446; 967 NE2d 729 (2012); but see *State v Blakenship*, 145 Ohio St 3d 221; 2015-Ohio-4624; 48 NE3d 516 (2015) (concluding that registration for an adult offender was not cruel and unusual).

[152] See, e.g., *In re Alva*, 33 Cal 4th 254; 92 P3d 311 (2004); *State v Guidry*, 105 Hawaii 222, 237; 96 P3d 242 (2004) (collecting sources); *People v Malchow*, 193 Ill 2d 413; 739 NE2d 433 (2000); *In re TH*, 913 NW2d 578 (Iowa, 2018); *State v Petersen-Beard*, 304 Kan 192; 377 P3d 1127 (2016); *Jeffries v Justice & Pub Safety Cabinet*, 605 SW3d 79 (Ky App, 2019); *Commonwealth v Becker*, 71 Mass App 81; 879 NE2d 691 (2008); *State v Boche*, 294 Neb 912; 885 NW2d 523 (2016); *State v Eighth Judicial Dist Court*, 129 Nev 492; 306 P3d 369 (2013); *In re JG*, 169 NJ 304; 777 A2d 891 (2001); *In re JB*, 419 SC 575; 799 SE2d 675 (2017); *Ex parte Robinson*, 116 SW3d 794 (Tex Crim App, 2003); *State v Domingo-Cornelio*, 26 Wash App 2d 187; 527 P3d 1188 (2023); *In re CG*, 403 Wis 2d 229; 2022 WI 60; 976 NW2d 318 (2022); *Snyder v State*, 912 P2d 1127 (Wy, 1996); *Smith*, 538 US 84; *Felts*, 674 F3d 599.

[153] See, e.g., *Weems*, 217 US at 363-364 (citing the record available below of the defendant's actions and the trial court's findings on the lack of harm to others); *Solem v Helm*, 463 US 277, 294, 296-297; 103 S Ct 3001; 77 L Ed 2d 637 (1983) (applying *Weems* and considering the circumstances of the defendant and his actions as well as noting the importance of the "particular context of the case") (quotation marks and citation omitted); *Lorentzen*, 387 Mich at 178-179, 181 (adopting *Weems* and discussing the status at issue with a "first offender" and defendant being 23 years old, without consideration of his history); compare *People v Adamowicz (On Second Remand)*, ___ Mich App ___, ___ n 10; ___ NW3d ___ (2023) (Docket No. 330612);

criminal penalties" support the purported punishment.[154]   Although registries are civil

mechanisms intended to provide the public with accurate and up-to-date information, they

advance significant interests of public safety and empower citizens to make informed decisions

in their daily lives.  It might prevent additional crime by allowing the public to take precautions

and by dissuading defendant from believing that he can successfully re-abuse children or others,

but the registry's interest in deterring the initial offense is limited, especially given the already

existing maximum prison term of 15 years.[155]   Defendant is not incapacitated by registration.

As a registrant, he has the ultimate authority on where to live, work, associate, and go about

daily behaviors.    Public safety information, like many regulatory regimes preventing

misconduct, has few rehabilitative characteristics.

      This Court's decision falls well outside accepted understandings of constitutional law.

The Michigan Supreme Court has held cruel and unusual punishment exists for a 20-year

sentence to prison for a 23-year-old man with no prior convictions for the distribution of *any*

---

slip op at 9 n 10 ("An as-applied constitutional challenge is based upon the particular facts surrounding defendant's conviction and sentence."), with *Council of Organizations & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 568; 566 NW2d 208 (1997) (explaining that a facial challenge, by contrast, requires proof that under "*no set of circumstances*" would the law be valid) (quotation marks and citation omitted; emphasis added).

[154] *Lorentzen*, 387 Mich at 180; *Hall*, 396 Mich at 658 (explaining the broad scope of the third factor and that rehabilitation "was not the only allowable consideration for the legislature to consider in setting punishment").

[155] *Shaw*, 823 F3d at 571 (holding that registries do not have an extensive deterrent effect given that the " 'incentive structure' " is not foundationally altered), quoting *Miller*, 405 F3d at 720; *Smith*, 538 US at 99 (explaining that the "principal effect" of the registry is "to inform the public for its own safety").

amount of marijuana where only one state imposed the same penalty,[156] life imprisonment without the possibility of parole for *simple possession* of 650 grams of cocaine where no state imposed a penalty "even remotely as severe,"[157] and *life imprisonment* with the possibility of parole for *juvenile* homicide offenders.[158] The Supreme Court of the United States has invalidated sentences of 15 years' hard labor for falsifying statements in a public document with no resulting harm,[159] life imprisonment without the possibility of parole for falsifying a $100 check under a recidivist statute,[160] and certain capital and life sentences for juvenile offenders.[161] Not once has this Court or the Supreme Court of the United States remotely suggested that public dissemination of accurate information of convictions, combined with periodic reporting to ensure the accuracy of that information, amounts to cruel or unusual punishment. Such measures are pervasive, routinely enacted in regulatory and registration regimes throughout the country, and do not approach the impositions and harshness of incarceration. This majority opinion marks a substantial departure from existing Michigan jurisprudence and significantly lowers the threshold of purported punishments that amount to unconstitutionally inhumane treatment, which courts can totally bar the Legislature and the people of Michigan from enacting.

---

[156] *Lorentzen*, 387 Mich at 178-179, 181.

[157] *People v Bullock*, 440 Mich 15, 40-41; 485 NW2d 866 (1992).

[158] *Stovall*, 510 Mich at 307-308.

[159] *Weems*, 217 US at 362, 382.

[160] *Solem*, 463 US at 281-282, 303.

[161] See, e.g., *Graham v Florida*, 560 US 48, 52-53, 82; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

## IV. CONCLUSION

It is important to note what the majority opinion is and what it is not. The majority opinion extends the Michigan Constitution to bar dissemination of accurate information to the public of those who have kidnapped and imprisoned children so that individuals in the community can have the knowledge to lead their lives as they so choose. In so doing, the majority opinion effectively concludes that the public cannot be trusted with accurate information of convictions, because it may in the view of the majority opinion, unduly shame or burden individuals who were indeed convicted of child kidnapping and imprisonment. Despite being enacted for decades by the federal government and 42 out of 49 other state jurisdictions, this Court concludes that public registration for such offenses does not even *reasonably* advance the interests of public safety and awareness. The majority opinion finishes with a conclusion never before reached by Michigan or federal courts: that public dissemination of conviction history, combined with registration requirements to ensure that the information is accurate, is so extraordinary and disproportionate to defendant's offense of violently imprisoning children while they plead dearly for their lives and the life of their mother amounts to cruel or unusual treatment. This is an extreme conclusion that will severely hinder this state from publicly recording and registering those who kidnap, abuse, or imprison children.

By contrast, the majority opinion is *not* limited "merely" to those registrants who kidnap and imprison children. The reasoning sowed throughout the majority opinion takes direct aim at the civil and public safety rationale of *all registries*. Almost the entirety of the majority opinion could just as easily apply to any public dissemination of accurate conviction information and attendant registration requirements. At every step of its analysis, the majority opinion is at odds with precedent of the Supreme Court of the United States from which Michigan takes its

jurisprudence on distinguishing civil measures and criminal punishment, and specifically the landmark decision in *Smith v Doe*,[162] of which the majority opinion clearly disapproves. Whether registration for all crimes is cruel or unusual, especially those less serious than kidnapping and false imprisonment, is yet to be determined, although it is notable that today's decision massively lowers the bar for demonstrating constitutionally inhumane treatment. Nonetheless, the majority opinion leaves the entire Michigan registry wide open for constitutional attack as criminal punishment.

In all, this Court continues on its line of decisions to undermine and ultimately defeat the effective functioning of public registries in Michigan. It is a disservice to the millions of residents, caregivers, and parents who depend on easily accessible information to take necessary precautions and protect children. In the course of its nitpicking the muddied social science research on registries and crediting its preferred conclusions, this Court serves to deprive Michigan residents of the power to make their own judgments on the value of registry information and to lead their lives as they so choose. Such a result finds no support in the law, our Constitutions, or a proper understanding of the judicial role. For the foregoing reasons, I dissent.

Brian K. Zahra
David F. Viviano

---

[162] *Smith*, 538 US 84.